RELLA B. EVANS, CLEMENTINA D. GREEN, MARY D. BASS and GERTRUDE POE, Appellants, v. H. B. ROTH and MYRTLE ANN ROTH. —No. 40189.—201 S. W. (2d) 357.

Court en Banc, April 21, 1947.

*Clark, Boggs, Peterson & Becker, Howard B. Lang, Jr.,* and *William L. Nelson, Jr.,* for appellants.

238

*George C. Miller* and *William H. Sapp* for respondents.

240

LEEDY, J.—By this action plaintiffs seek an injunction to restrain defendants from continuing the use of their building as an apartment house in alleged violation of the zoning ordinance of the City of Columbia. Decree for defendants, and plaintiffs appealed to the Kansas City Court of Appeals which, by a divided court, affirmed the decree. On plaintiffs' application to this court, the cause was transferred here. Having been briefed on the merits and decided by the Court of Appeals, it will be determined in this court as on original appeal. [See Rule 2.06, and Carr Missouri Civil Procedure sec. 2086.]

In 1935 the City of Columbia adopted a comprehensive zoning ordinance. By its ▮▮ terms the city was divided into seven districts for the purpose of regulating and restricting the erection, alteration, repair and use of structures and land, the density of population, etc. Sec. 1160 of the ordinance, relating to District A, or First Dwelling District, specified as a particular use permitted therein "Dwellings", and by Sec. 1156 defined "dwelling" as "A building arranged, intended, designed for, or occupied by not more than two families." The premises in question are in the "First Dwelling District", and hence restricted to occupancy by not more than two families.

In March 1940, the property, then a vacant lot, was owned by one Trowbridge and his wife. They applied to the City Planning and Zoning Committee to re-zone the lot to permit the erection of an apartment house, which was denied March 26, 1940. They then applied for a building permit for a structure denominated a "duplex", which was denied April 6. On April 8, they sought reconsideration of their application to re-zone, but were unsuccessful. On June 5, they were issued a building permit for the erection of a 12 room duplex, but on June 17, the City Engineer's office wrote a letter to Mr. Trowbridge calling attention to the fact that plans [subsequently ?] submitted called for a third complete unit, on the basement or terrace level, in addition to the two family facilities on the other floors, making a total of 17 rooms, and demanded compliance with the building permit. Such permit authorized the construction of a brick and tile two story duplex, or two family dwelling, containing 12 rooms. In 1940, while construction was in progress, the acting City Engineer and the City Attorney inspected the building and found that, contrary to the plans, two kitchens were being installed on each of the floors above the ground level; that unauthorized apertures had been constructed in the north wall of the west suites on both floors, giving access to the back porch. The building inspector required the dismantling of the two extra kitchens, the removal of a rear stairway, the permanent closure of the unauthorized doorways (by sealing them with brick and tile), and the removal of certain electrical wiring, and kitchen plumbing. As thus altered to conform more nearly to the

plans under which the permit was issued, the building was completed, and thereafter occupied. In this connection, defendants' statement recites that "the Trowbridge family moved into the first floor of the house and promptly rented the second floor to another family. Each of the family groups rented their spare bed-rooms to roomers."

In July, 1943, the Trowbridges again applied for re-zoning of the lot so as to permit it to be used for an apartment house. This proposed change, like the earlier ones herein mentioned, was protested by the neighboring property owners, including plaintiffs. The application was again denied. In August, 1943, the city authorities caused an inspection to be made of the premises. Present at such inspection were the City Engineer, the City Attorney, and the Plumbing Inspector. They had been directed by the Mayor "to see if the building had been altered since the time of construction." The City Engineer orally reported back to a meeting of the city council that "as far as we could tell the building is now in the same condition as it was, from the reports to me from the previous inspectors." In other words, that the building was, in August, 1943, in the same condition as it had been after it had been altered at the direction of the building inspector in 1940. The Trowbridges sold and conveyed the property to the defendants in July, 1944, and about a month thereafter the Roths took in "as roomers" (under their contention) Mrs. Hetzler, who occupies the west suite (or apartment) downstairs, and two young ladies, who occupied the west suite (or apartment) upstairs. The east suite on the second floor (containing a kitchen) was then occupied by one Hill and his wife and son. Two students occupied quarters in the basement. Such was the situation when the suit was filed September 25, 1944.

Plaintiffs alleged, and the proof sustains the charge, that the operation of the structure as an apartment house would make their properties less desirable as residential property, greatly depreciating its value and usefulness; in other words, that they will suffer special damages. The foregoing facts constitute a sufficient statement for the purpose of determining the first question presented, i. e., whether plaintiffs may maintain the action. Defendants contended, and the majority opinion of the Court of Appeals held, that plaintiffs could not maintain the suit because they had not exhausted their administrative remedy, by resort to the city authorities for relief, and by certiorari to the circuit court should such relief be denied by the city authorities, as provided by the ordinance and the state statutes. Other pertinent and more detailed facts in reference to the construction and use of the structure will be stated in connection with our consideration of the merits of the case, if it becomes necessary to extend the inquiry into that field.

Addressing ourselves to this preliminary question, we bear in mind that the constitutionality of the zoning ordinance is not in question.

242

Nor is it contended that it does not conform, in any respect, to the enabling act, or legislative grant of power conferred upon certain municipalities, such as Columbia, to enact zoning ordinances, under Chap. 38, Art. 12, Secs. 7412-7423, R. S. '39 and Mo. R. S. A. The City Engineer is ex-officio Building Inspector under Sec. 132, Art. IX of the Revised Ordinances of the City of Columbia, 1932. This section, and Sec. 133 thereof (both of which were offered in evidence) are, we assume, a part of the city's building code, as distinguished from the subsequently enacted zoning ordinance. Sec. 133 provides that the building inspector shall ''enforce the provisions of this code''; and makes it his duty, among other things, to issue permits and notices, pass upon questions relating to the mode, manner of construction or materials to be used in the erection or alteration of a building, and to supervise the construction or reconstruction of all buildings, and to make rules and specifications to assist in the proper application of the code. It is also his duty to recommend to the City Attorney to institute any and all actions that may seem proper or necessary for the enforcement of the code. He is required to ''keep an accurate record of all matters pertaining to the duties of his office.''

Turning to the zoning ordinance, we find that Sec. 1177 thereof provides: ''It shall be the duty of the Building Inspector to enforce the provisions of this ordinance and to refuse to issue any building permit for any building or structure which would violate any of the provisions hereof, and the said Building Inspector or any deputy or inspector working under his direction, by and with the consent of the Building Inspector, is hereby authorized and instructed to arrest, prosecute, or bring any proceedings in a proper court in the name of the City of Columbia against any person violating any of the terms of this ordinance, and in case any building or structure is erected, constructed, re-constructed, altered, repaired, converted or maintained, or any building, structure or land is used in violation of this ordinance, said Building Inspector is hereby authorized and directed to institute any appropriate action or proceedings to prevent such unlawful erection, maintenance, construction, re-construction, alteration, repair, conversion or use, to restrain, correct or abate such violation and to prevent any illegal act, conduct or use on or about such premises.''

Sec. 1178 directs that no permit for the erection, alteration or enlargement of any building shall be issued unless there first be filed a plat showing the location and dimensions of the lot to be occupied, the dimensions and location of the building on the lot, together with a true statement showing the use for which such building is arranged, intended or designed, and such other information as the Building Inspector may require. A record of such applications and plants is required to be kept in the office of the Building Inspector.

Sec. 1179 creates a Board of Adjustment consisting of five members, and, among other things, authorizes the board to adopt rules; provides for the administration of oaths, and for compelling the attendance of witnesses; requires that the board "shall keep a record of its examinations and all other official actions, all of which shall be immediately filed in the office of the board, and shall become a public record. All testimony, objections thereto, and rulings thereon shall be taken down by a reporter employed by the board for that purpose."

Sec. 1180 provides that appeals "to the Board of Adjustment may be taken by any person aggrieved, or by any officer, department, board or bureau of the municipality affected by any decision of the Building Inspector." Such appeal is required to be taken within a reasonable time, as provided by the board's rules, by filing with the Building Inspector and with the board a notice of appeal specifying the grounds thereof. It further provides that "all of the papers constituting the record upon which the action appealed from was taken" be forthwith transmitted to the board; makes provision with reference to stays, and requires the board to fix a reasonable time for the hearing of the appeal, upon public notice thereof, and to the parties in interest, and to decide the same within a reasonable time.

Sec. 1181 provides that the Board of Adjustment shall have the following powers:

"1. To hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this ordinance.

"2. To hear and decide all matters referred to it or upon which it is required to pass under this ordinance.

"3. In passing upon appeals, where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of such ordinance, to vary or modify the application of any of the regulations or provisions of such ordinance relating to the use, construction or alteration of buildings or structures or the use of land so that the spirit of the ordinance shall be observed, public safety and welfare secured and substantial justice done. In exercising the above mentioned powers such Board may, in conformity with the provisions of this ordinance, reverse or affirm wholly or partly, or may modify the order, requirement, decision or determination appealed from and may make such order, requirement, decision, or determination as ought to be made, and to that end shall have all the powers of the Building Inspector."

Sec. 7419 of the state statute provides that in case "any building . . . constructed . . . altered, converted or maintained, or any building, structure or land is *used* in violation of this article (relating to zoning) or of any ordinance or other regulation made . . . the proper local authorities of the municipality; in addition to other remedies, may institute any appropriate action or proceedings

to prevent'' the same. Such regulations shall be enforced by the superintendent of buildings or other official authorized to issue building permits ''who is empowered to cause any building, structure, place or premises to be inspected and examined *and to order in writing the remedying of any condition found to exist therein or thereat* in violation of any provision of the regulations made under authority of this article''. (Italics ours.)

This section declares that the violation of any provision or regulation shall be a misdemeanor punishable as such, and ''Any such person who having been served with an order to remove any such violation shall fail to comply with said order within ten days after such service or shall continue to violate any provision of the regulations made under authority of this article in the respect named in such order shall also be subject to a civil penalty of two hundred fifty dollars''. This provision is incorporated in the ordinance as Sec. 1185.

It was, in large measure, upon a construction of Sec. 7419, and particularly the portion we have italicized, that the Court of Appeals held that plaintiffs could not maintain this action. Of course, if the plaintiffs had an adequate statutory remedy, the procedure prescribed therefor would be exclusive. But do the provisions of the ordinance and the statute empowering the Building Inspector to enforce the ordinance, and empowering him ''to cause any buildings, structure, place or premises to be inspected and examined and to order in writing the remedying of any condition found to exist therein or thereat in violation'' of the regulations, when coupled with the appeal provisions we have noticed, constitute such a plain, complete and adequate remedy as to deprive a court of equity of jurisdiction to grant relief to adjacent property owners in the particular circumstances of this case? We think not. It will be noted that the statute and ordinance do not purport to provide procedure by which adjoining property owners, or others interested, may institute complaints to the Building Inspector, or that his inspection, or any order in consequence thereof, shall or may be based upon any such complaint. And, unlike some zoning ordinances referred to in cases from other jurisdictions, there is no provision in the one under scrutiny providing for a permit or certificate of use or occupancy, apart from the building permit itself.

In Taylor v. Schlemmer, 353 Mo. 687, 183 S. W. 2d 913, injunction was granted to enjoin violation of a St. Louis zoning ordinance. The question of plaintiffs' right to maintain the action because of their failure to exhaust the administrative remedy here involved was not raised. On the question of joinder of parties, it was held that the Building Commissioner was not a necessary party. In that case, however, the city was permitted to join as a party plaintiff.

The annotation in 129 A. L. R. 885, on the subject of ''Injunction as remedy for violation of zoning ordinance'', supplementing that in

54 A. L. R. 366, states, ''In most of the jurisdictions in which the question has arisen, it has been held that a property owner, at least upon showing that special damage by way of diminution in value of his property has been or will be suffered by him as a result of the violation of the particular zoning ordinance, may pursue the remedy of enjoining such violation and some of the courts held that this may be done even in the absence of express authority in that regard either in the ordinance or in a statute.'' The authorities cited are in accord. For example, in Marcus v. Village of Mamaroneck, 283 N. Y. 325, 28 N. E. 856, decided by the Court of Appeals of New York, it was held that ''The provision that an official of the village shall enforce the zoning ordinance does not prevent a private owner who suffers special damage from maintaining an action for redress [injunction to restrain violations of the zoning ordinance]. The plaintiffs have the capacity to sue . . .'' See, also, Zimmerman v. O'Meara, (Iowa) 245 N. W. 715; Holzbauer v. Ritter, 184 Wis. 35, 198 N. W. 852, and cases therein cited. Compare New Mission Baptist Church v. City of Atlanta, 37 S. E. 2d 377.

''So, injunction will in a proper case issue at the instance of one who thus suffers injury . . . by reason of the violation of a zoning ordinance. 28 Am. Jur., Injunctions, sec. 152, p. 344, citing Fitzgerald v. Merard Holding Co., 106 Conn. 475, 138 Atl. 483, 54 A. L. R. 361. [Annotation.]

Thompson on Real Property (Per. Ed.), Vol. 10, p. 727, sec. 5632, lays down the proposition that ''A private individual has the right to maintain an action to compel the owner of a building to make it conform to the zoning regulations of the municipality, and to restrain the owner from using it for nonconforming purposes when the nonconforming use will result in a special damage to the plaintiff. Under such circumstances, the plaintiff's right to relief is not dependent upon his having requested the public authorities in charge to enforce the ordinance and prevent its violation.''

Not entirely beside the point is the statement in 42 Am. Jur., Public Administrative Law, sec. 252, p. 694: ''The exclusive jurisdiction of an administrative agency to enforce and protect public rights is not affected by the existence of a private right in the same subject matter, which latter right is incidentally enforced and protected in the enforcement of the public right. The administrative agency still has jurisdiction of the public right, although the courts have jurisdiction of the private right.''

The cases relied on by defendants are Superior Press Brick Co. v. City of St. Louis, (Mo. App.) 155 S. W. 2d 290, and Hernreich v. Quinn, 350 Mo. 770, 168 S. W. 2d 1054. The first of these was a suit to prevent the city and its officers from enforcing the provisions of a zoning ordinance. The plaintiffs had applied for a permit to erect a tipple and hoisting apparatus, which the building commissioner

denied on the ground that mining and removal of fire clay from the land would be a violation of the zoning ordinance. The decision was appealed to ▮▮▮ the Board of Adjustment, which sustained such refusal. The question presented to the St. Louis Court of Appeals was whether the plaintiffs should have exhausted their remedy at law by presentation to the circuit court of a petition for a writ of certiorari to review the decision of the Board of Adjustment, and this question was answered in the affirmative. The situation there presented was squarely within the statute. A permit was required. It was applied for and denied. The appeal provision was invoked, but review, although available, was not pursued beyond the Board of Adjustment. The case was properly decided. Similarly, in Hernreich v. Quinn, supra, the Hernreichs, by appeal to the Board of Adjustment, had obtained a permit sanctioning their occupancy of a garage-residence built in violation of the zoning ordinance, and relaxing the "rear yard" provisions of the ordinance. Said this court: "To attack that decision the Berards [the abutting property owners] were bound to exhaust their remedy by certiorari under the ordinance before they could resort to an action at law or in equity (unless they desired to challenge the constitutionality of the ordinance, which of course they did not, since they were invoking it.)" There, just as in the Superior Press Brick case, a decision had been rendered in reference to a required permit, which was subject to review in the manner provided by the ordinance and statute.

In the Court of Appeals the defendants took the position that the action of the Building Inspector in 1940, whereby the Trowbridges were required to remove the two kitchens, seal the doors, etc., constituted a "decision" (involving the question of the use to which the building could be lawfully put), which was reviewable by appeal to the Board of Adjustment, and thence by certiorari to the circuit court; and having failed to seek such review, plaintiffs cannot maintain this action. In their supplemental brief in this court, they take the further position that the plaintiffs were required to apply to the Building Inspector for abatement of the alleged improper use of the property, and to appeal from his decision, if adverse, and this, admittedly, was not done. We think neither position is tenable. Plaintiffs were not aggrieved by the "decision", if such it was, under which the unauthorized kitchen and other facilities were caused to be removed in 1940. They acquiesced in, if, in fact, one of them had not demanded, such removal. It is the use to which the premises were subsequently subjected to which plaintiffs object. We hold in conformity with the rules hereinabove cited, that plaintiffs were not imperatively required, under the ordinance and the statute, to complain to the Building Inspector so as to obtain abatement, through action on his part, of the offending use of the property. Plaintiffs have the

capacity to maintain the action, and the chancellor did not err in so holding.

Consideration of the merits of the case, made necessary by the foregoing, requires further development of the facts. The building faces south. The front door is located in the center of the building. It leads into a small hall or entry, from which there is a stairway (to a like hall or entry on the second floor) with a door leading into the apartment on the east, and a door leading into the suite or apartment on the west. Access to the second floor suites is by the same arrangement. There is also a similar hall on the second floor immediately over the entry on the first floor, with doors similarly arranged, giving access to the deck over the front porch to the occupants of each suite or apartment. The doors in the hall or entry on each floor are opposite each other, and when open, one can see across the entry from one unit into the other.

The east apartment on each floor contains a living room, sun room, dining room, bed room, bath and kitchen. That on the first floor is occupied by defendants, and that on the second floor by their tenant, Mr. Hill and his family. The west unit on each floor consists of two large rooms connected by a hall, with a bath room, in between, and a smaller room on the north. Mrs. Hetzler occupies the west unit on the first floor, and the teachers the west unit on the second floor. The two units or apartments on the second floor are not otherwise connected than through doors into the hall, landing, or entry at the top of the stairs, and the hall or entry giving access to the deck. On the first floor, there is, in addition to the entry, a door leading from the kitchen to the small room on the north. In short, the construction and arrangement of the building is such that, except for the absence of a kitchen in each of the west units, it would be unquestioned that the structure contains four separate and independent apartments, but adaptable, also, for occupancy as a duplex, or two family dwelling.

At the front door there are four separate door buzzers, numbered 1 to 4, each bearing a name plate, and connected to the units respectively occupied by the occupants. Each suite or unit has a separate telephone, paid for by the occupants. Mrs. Hetzler paid her own water and light bills. Heat to all units is furnished by defendants. Each of the west units contained a furnished living room, two bed rooms, and a refrigerator. The occupants of these quarters received their company in their own living rooms, and Mrs. Hetzler gave music lessons in her living room. Mrs. Hetzler rents by the month at $40.00. She furnished her own rooms, and, as stated, pays her own water, light and telephone bills. She installed her own chimes in place of the buzzer. When she has house guests she does not have to obtain permission from defendants. Mrs. Roth has a duplicate key to Mrs. Hetzler's quarters, and frequently the doors between their

248

units are left open. On the question of access, Mrs. Hetzler testified as follows:

"Q. Were you to have access to her part? A. Absolutely. She has a key to my room, and when I am gone she goes in there.

"Q. You as a roomer, and she as a landlady? . . . A. That was the understanding."

Miss Press, one of the teachers, testified she and Miss Allison paid $22.50 each for their quarters, to which Mrs. Roth was to have access. They furnished their own bedding. Miss Allison testified (by deposition) that they were to have complete use and charge of their unit; that they sent out and paid for the laundering of their bedding, towels and linens; that they kept " 'cokes' and bottle milk and a few things like that" in the refrigerator, and occasionally prepared and ate breakfast there.

Mrs. Hetzler, the teachers, and one of the students all testified to the effect that their quarters were rented to them by defendants on condition that they were not to cook therein; that their occupancy. was to be as roomers.

The basement contains the heating equipment. It was at no time rented to a family group. Student roomers, individually, had occupied parts of the basement at times but never had prepared or eaten their meals therein. There are no cooking facilities in the basement. It has four rooms and is equipped with a bath room and a shower. Two rooms are occupied by students. There is also a room in the southeast corner of the basement called a "plunder room" and a vacant room in the southwest corner. In addition there is a "racket room". The rooms are all finished and plastered. The roomers in the basement are compelled to "go through the basement" to get to the bath room. The furnace in the basement almost blocks the passageway through the outside door leading thereto.

The former City Attorney, the former Building Inspector, and the President of the Realtors Association of Columbia, and others, were called as witnesses for the defendants. They testified that the house was a two family dwelling or a duplex and not an apartment house; that an apartment in an apartment house, according to a common understanding among real estate men in Columbia, consists of a complete living unit with kitchen, bath and necessary facilities for ordinary housekeeping.

Defendants testified that they never permitted anyone to occupy any part of the house, other than as a roomer, except themselves and the Hill family; that they never had more than four or five roomers in the house; that such roomers, as Mrs. Hetzler, were restricted to the privileges of ordinary individual roomers; that defendants retained control of, and dominion over the parts of the house let to said roomers; that they never used the house as an apartment house but instead used and operated it as a two family duplex.

Sec. 1156 of the ordinance defines certain words used in the ordinance, as follows:

Apartment: A suite of rooms or a room in an apartment house arranged, intended, designed for, or used as the place of residence of a single family or group of individuals living together as a single housekeeping unit.

Apartment House: A building arranged, intended, designed for, or occupied by more than two families.

Apartment Hotel: An apartment house which furnishes for the use of its tenants services ordinarily furnished by hotels, but the privileges of which are not primarily available to the public.

Boarding House or Lodging House: A building other than a hotel, occupied as a single housekeeping unit, where lodging or meals are provided for five or more persons for compensation, pursuant to previous arrangements, but not for the public or transients.

Dwelling: A building arranged, intended, designed for, or occupied by not more than two families.

Family: Any number of individuals living together as a single housekeeping unit, as distinguished from a group occupying a boarding house, lodging house or hotel as defined herein.

We agree with respondents that the building "was capable of multiple uses", and that the true character of the operation in question must be determined by the physical conditions and the actual uses to which the quarters were devoted. Much is said about the meaning of the term "single housekeeping unit", the signification of "family", etc., and that it is common knowledge that families or housekeeping groups need and have cooking facilities in towns like Columbia. We pause here to say that the construction put upon the zoning ordinance by the city officials and real estate men cannot alter its meaning. Reduced to its simplest terms, the question is ultimately this: Does the circumstance that kitchens are lacking in two of the units deprive these separate, independent, and disconnected suites of their character and identity as "apartments", and so permit the operation as a duplex of that which would otherwise be an "apartment house"? We think not. Obviously whether an apartment is such, or not, under the ordinance, does not turn on the question of whether it contains a kitchen or kitchen equipment. Conversely, would an apartment be any less an apartment because the tenant chose to eat out, and did not actually use the kitchen as such? We may take judicial notice that bachelor apartments do not customarily include kitchen equipment, and there is nothing in the ordinance, as presently drawn, to exclude such units from the ordinance definition of an apartment. Bearing in mind the ordinance definitions, and applying them to the facts here involved, we have no difficulty in finding that the west suites, like those on the east, are used as single housekeeping units, and, under the ordinance, such use is proscribed Nor will it

do to say that it is affected by the oral arrangement (doubtless. entered into in good faith) whereby defendants undertook to style the nature of the occupancy of Mrs. Hetzler and the teachers as roomers rather than as tenants.

The judgment is reversed, and the cause remanded with directions to award the injunctive relief prayed. All concur.