Vincent J. FEELY et al.,
Plaintiffs-Respondents,

v.

Louis I. BIRENBAUM et al.,
Defendants-Appellants.

Nos. 37743, 37736.

Missouri Court of Appeals,
St. Louis District,
Division Three.

May 24, 1977.

Motions for Rehearing and/or Transfer
Denied July 21, 1977.

Applications to Transfer Denied
Sept. 12, 1977.

Goldstein & Carey, Kathy Carey, Stanley E. Goldstein, Clayton, for defendants-appellants.

Schmitz & Fischer, Mary Stake Hawker, J. Peter Schmitz, St. Louis, for plaintiffs-respondents.

GUNN, Judge.

Plaintiffs-respondents brought suit to enjoin and restrain defendants-appellants, two unrelated males, from residing together or with persons unrelated by blood, marriage or adoption at defendants' single family residence. The trial court found that the subdivision trust indenture applicable to defendants' residence prevented defendants from living together in their single family residence. The primary issue on appeal is whether the subdivision trust indenture proscribing the use of houses within the subdivision by more than one family interdicted defendants' use of their house with unrelated persons. We find no error in the trial court's interpretation of the trust indenture and affirm the judgment.

According to the stipulation of facts, defendants purchased a lot and house in a private residential area in University City known as Ames Place. The purchase was with knowledge of the recorded subdivision trust indenture which prohibited any residence lot owner "to erect or permit to be erected on said residence lots, or any of them, any flat or apartment house, or use or permit to be used any house or houses erected on any such residence lots as a flat or apartment house, or *by more than one family.* * * * *" (emphasis added). The trust indenture was initially recorded in 1914 and extended to 1984.

Defendants moved into their house in June, 1971, and at or about the same time a woman identified only as Marsha Back became a regular resident in the house with defendants and remained there until January, 1975. Also, in September, 1971, a male law student moved into defendants' house to reside there for about nine months. It was agreed that none of the parties living in defendants' Ames Place house, including defendants, was ever related by blood or marriage.

■ Subsequently, plaintiffs as elected representatives of the Ames Place Association and pursuant to the authority invested in them by the trust indenture to enforce its provisions, filed suit to enjoin defendants from violating the trust indenture and forbid defendants' use of the house as other than a private residence for one family.[1] There has been no challenge made as to the validity of the Ames Place single family stricture as it applied to the defendants' property. Thus, the only substantive issue for the trial court's determination was whether the group of people living in the house (or even only the two defendants) could be characterized as "more than one family" within the meaning of that term in the trust indenture. The trial court found the issue against defendants and ordered that defendants and each of them be "enjoined and restrained from both regularly and consistently residing together at 324 Melville" (defendants' house) and "from residing regularly and consistently at said premises with any other person unrelated to him by blood, marriage or adoption."

■ Before discussing the central theme of this case—the single family issue—we dispose of two tangential issues raised by defendants. Defendants argue that as defendant Friedman had filed an affidavit with the trial court of his intention to move from the premises and sell his interest in the house to defendant Birenbaum that the case is moot. However, the record fails to disclose that defendant Friedman's intentions have been fulfilled. We thus have no evidence before us upon which to rule that the case is moot and cannot give consideration to defendants' argument in this regard. *State ex rel. Freeze v. City of Cape Girardeau,* 523 S.W.2d 123 (Mo.App.1975); *Davis v. Long,* 521 S.W.2d 7 (Mo.App.1975).

---

1. On appeal, defendants do not attack plaintiffs' standing to enforce the provisions of the restrictive covenant, and clearly plaintiffs have such standing. *Eyerman v. Mercantile Trust Co. N.A.,* 524 S.W.2d 210 (Mo.App.1975); *Kuhs v. Kawelaske,* 516 S.W.2d 309 (Mo.App.1974).

■ Defendants also assert the defense of laches, claiming that although defendants moved into their house in July 1971, suit was not brought against them until November, 1972—a 16 month lapse. Defendants argue that plaintiffs knew of defendants' living arrangement when they moved into the house and that the delay in bringing suit wrought an injustice upon defendants who had spent many hours refurbishing their house. Again, defendants allegations as to damages were not proved. Nothing regarding damages appears in the stipulation of facts, so there is nothing for us to consider as to defendants' alleged damages. *Laclede Gas Co. v. Hampton Speedway Co.*, 520 S.W.2d 625 (Mo.App. 1975). The record is therefore barren of proof that any disadvantage or prejudice was worked upon defendants; consequently, laches as a defense is unavailable to defendants on this appeal. *L___ v. R___*, 518 S.W.2d 113 (Mo.App.1974).

■ We now reach the cynosure of this case—whether the trial court was correct in construing defendants' use of their house to be "by more than one family" within the meaning of the trust indenture proscription. We believe the trial court was correct in its finding and conclusion.

We recognize that there is no single definition of the word "family," but, rather, the term has been construed according to the particular facts presented on the issue.[2] As stated in *Boyher v. Gearhart's Estate*, 367 S.W.2d 1, 5 (Mo.App.1963), "[t]he term family is one of great flexibility and is capable of many different meanings according to the connection in which it is used." *Steva v. Steva*, 332 S.W.2d 924 (Mo.1960), defines family as follows, l.c. 926:

"The term 'family' * * * 'has been defined as a collective body of persons under one head and one domestic government, who have reciprocal, natural, or moral duties to support and care for each other.'"

And in *State ex rel. Ellis v. Liddle*, 520 S.W.2d 644 (Mo.App.1975), a zoning ordinance was interpreted as not limiting the term "family" to persons related by blood, marriage or adoption. However, the zoning ordinance involved in *Liddle* specifically provided that a limited number of persons not related by blood, marriage or adoption were to be included within the term "family," so that case is not felicitous here.

■ In interpreting the meaning of the words in the trust indenture restricting the use of the Ames Place homes "by more than one family," we must look at the plain and obvious purpose of the restriction and give the terms used their ordinary and usual meaning in the connection in which they are used. *Andrews v. Metropolitan Bldg. Co.*, 349 Mo. 927, 163 S.W.2d 1024 (1942); *Greenberg v. Koslow*, 475 S.W.2d 434 (Mo. App.1971); *Boyher v. Gearhart's Estate, supra.* The test for determining the meaning of commonly used words "should be their ordinary and popular meaning; and they should not be construed in the broadest sense possible to include meanings to which they would not be applied by most people." *Cleaver v. Central States Life Ins. Co.*, 346 Mo. 548, 142 S.W.2d 474, 477 (1940). Using this gauge, can we find that the trial court erred in concluding that a group of up to four unrelated adults living together was not a "family" within the trust indenture restriction? Indeed not. We believe that within the context and purpose of the Ames Place trust indenture, the stricture on the use of each house to one family could properly be construed as intending to limit the use to a single family related by blood, marriage or adoption—as was construed by the trial court.

Ames Place is a single family subdivision, well maintained by upper middle income residents with private streets closed to through traffic. As such we believe that the situation here is much the same as confronted by the court in the companion cases of *Pierce v. St. Louis Union Trust Co.*, 311 Mo. 262, 278 S.W. 398 (1925), and *Pierce*

---

**2.** Reference is made to Annot., 71 A.L.R.3d 693 (1976), which contains a comprehensive and interesting treatment of "family" as that term relates to zoning regulations and restrictive covenants. Also see: Missouri Digest, Words and Phrases, "Family."

v. *Harper*, 311 Mo. 301, 278 S.W. 410 (1925). In the *Pierce* cases, the restrictive covenants of deeds affecting Vandeventer Place in St. Louis, a private, single family residential subdivision, restricted use of the houses to the owners "with their respective proper families . . . (but not exceeding one family for or in respect to each of said lots) * * * " Upon a charge that one of the lot owners was permitting "more than one proper family per lot" to make use of her residence (actually, the lot owner was running a boarding house), the court held in *Pierce v. Harper, supra* 278 S.W. at 412:

> "[T]hat the intention of the parties to the original deed, as disclosed by the context of said deed and the surrounding facts and circumstances, and the intention of the present owners of property in said addition, as disclosed by their practical construction of such covenants, evidenced by their own acts and conduct, clearly makes manifest that such owners intended, and still intend, that Vandeventer Place shall be and remain a high class, exclusively residential district, and that the meaning, force, and effect of said restrictive covenants is to limit the use of each dwelling house or home on each lot of the addition to one single family."

It was also held that allowing a residence to be used by persons "not members of one proper family" was:

> "[N]ot as a private dwelling house or home for the use or occupancy of one single family. Such use is in derogation of the restrictive covenants affecting said premises." *Id.* 278 S.W. at 412.

We find it evident that the court in the *Pierce* cases was interpreting a single family use restriction similar to the one in this case as a restricted use to the designated "one single family" or "one proper family" and meaning that such use was limited to persons related by blood, marriage or adoption; that the interpretation placed upon the trust indenture restriction by the trial court in this case, limiting the use to families related by blood, marriage or adoption, is therefore reasonable and proper.

■ *Cash v. Catholic Diocese of Kansas City–St. Joseph,* 414 S.W.2d 346 (Mo.App. 1967), also offers guidance for us. In *Cash*, a group of teaching nuns sought residence occupancy in a private area restricted to "single family dwellings only." The trial court in *Cash* enjoined the use of the property by the nuns, and in affirming the trial court, the Court of Appeals quoted from the trial court's decision as follows, l.c. 349:

> " 'There can be no argument with the proposition that a building for occupancy by a group of people, all of whom are related to one another by blood or marriage, might properly be described as a 'single family dwelling'. We believe that the proposed residence for nuns may not be so described, if for no other reason, because there are in common use other words that describe such a building without resort to that word that has another widely accepted meaning. The residence for nuns might be described as a boarding house, sorority, or club. Or if one wanted to emphasize the religious status which its occupants would have in common, one might call it a convent, . . . But would most people describe the nuns that live there at a particular time as a 'family' or their residence as a 'single family dwelling'? We think not.' "

So, too, do we believe that it was not unreasonable for the trial court in this case to conclude that defendants' use of their house—where two, three and four unrelated persons lived together at one time or another—was a use by more than one family. We also find that the restriction placed upon the use of the property as construed by the trial court is sufficiently definite. We also believe our decision in this regard to be consonant with the *Pierce* and *Cash* cases.

■ Defendants suggest that the restriction imposed by the trial court is anachronous and too narrow and urge us to accept the 1971 version of the University City House Code definition of "family," which includes "a group of not more than three persons (excluding servants) not related by

blood or marriage, living together as a single housekeeping unit in a dwelling unit." Although defendants attached a copy of the University City House Code to their brief, it does not form a part of the transcript. Thus, we reject any consideration of the University City House Code, for it is neither a part of the transcript, nor do we take judicial notice of it. *State ex rel. Freeze v. City of Cape Girardeau, supra.* Further, even if we were to consider University City's housing code it would not be persuasive to our decision. We look to see how the parties within Ames Place intended the "family" use restriction to be applied. We believe it palpable that it has been the intention of the Ames Place residents to limit the use of individual houses to "families" within that term's common meaning—persons related by blood, marriage or adoption, or, at least, such an interpretation as made by the trial court is reasonable and proper under the circumstances here.

The judgment is affirmed.[3]

KELLY, P. J., dissents in separate opinion.

WEIER, J., concurs.

KELLY, Presiding Judge, dissenting.

I respectfully dissent because I believe that the manner in which this cause was presented to the trial court did not provide it with sufficient facts to support the judgment entered and for that reason would reverse and remand the cause to the trial court for a new trial.

The cause was submitted to the trial court on the pleadings, a stipulation of facts and certain exhibits, including among others, the Indenture restricting the type of buildings to be erected and the use to be made of said buildings within the platted subdivision. No oral testimony was adduced by either of the parties. Nevertheless, the fact that the cause was so submitted to the trial court for decision does not relieve the plaintiffs of their burden of proving each and every element of their case not admitted by the defendants. I have concluded the plaintiffs have failed to carry their burden of proving that the defendants have been in violation of the Indenture restrictions and that the trial court erred in its definition of the terms "no more than one family" to mean that only persons related by blood or marriage or adoption could take up residence in defendants' home.

This cause requires the construction of the terms of an Indenture restricting the type of construction and the use permissible in the Ames Place subdivision, and the Indenture is to be construed under the general rules applicable to construction of restrictive covenants running with the land. These general rules are too well known to require extensive citation of authority. The fundamental rule in the construction of restrictive covenants is that the intention of the restrictor as evidenced by the written instrument governs, and restrictive covenants are to be strictly construed in favor of free use of property. All doubts are to be resolved in favor of the free use of the property and the covenants should never be applied to defeat the plain and obvious purpose of the restriction. Absurd interpretations are always to be avoided. *Shepherd v. State*, 427 S.W.2d 382, 386–387 (Mo.1968). Restrictions on the use of land will not, however, be extended by implication to include anything not clearly expressed in them, and if there is substantial doubt of their meaning, such doubt should be resolved in favor of the free use of the property. *Marks v. Bettendorfs, Inc.*, 337 S.W.2d 585, 590[6–8] (Mo.App.1960).

To ascertain the intention of the "restrictors" with respect to this Indenture we

---

3. Plaintiffs-respondents initially filed a cross-appeal from that portion of the trial court's judgment which denied their attorney's fees. Plaintiffs' cross-appeal was assigned this court's No. 37736, and plaintiffs have sought leave to dismiss their cross-appeal for attorney's fees; leave granted.

Plaintiffs have also urged that the defendants' brief be stricken for failure to comply with Rule 84.06(d) and that their appeal be dismissed as being untimely. In view of our decision affirming the trial court, we need not consider these contentions.

must look to the Indenture itself. The document consists of thirty pages obviously prepared by the legal department of a trust company for the developers of the Ames Place subdivision. The portion of the Indenture to be construed, sub-paragraph 2 of Clause E, reads as follows:

". . . ; said persons agree . . . not to build *more than one single dwelling* upon any one residence lot; . . . not to use or permit any residence or building on any of said residence lots to be used, directly or indirectly, for business of any character, or for any other purpose other than that of an *exclusive private residence* (except that a physician or dentist residing therein may have his office and practice his profession in his residence); not to erect or permit to be erected on said residence lots, or any of them, any *flat* or *apartment house*, or use or permit to be used any house or houses erected on any such residence lots as a *flat* or *apartment house*, or by *more than one family*, . . . " (Emphasis supplied).

In addition, the Indenture specified that no house could be erected which cost less than $5,000.00, that building lines had to be observed, that the residences erected on the lots would have to face specified directions, and other restrictions not necessary to this opinion.

From the pleadings, the stipulation of facts and the documentary evidence the facts viewed most favorably in support of the judgment are that the appellants—the defendants in the trial court—are two adult males who purchased a residence in the subdivision known and numbered 324 Melville on or about June 29, 1971. They received a General Warranty Deed which recited that it was subject to restrictions of record. The Indenture was a matter of record and at the time of the purchase the appellants were furnished a copy of same. The house they purchased was a residence. The character of the neighborhood was "residential," the houses therein were "substantial" and were occupied by "middle income residents, many of whom are professional people." While a few of the lots in

the subdivision were excepted from this restriction, 208 of the lots in the subdivision were subject to the same restriction. The appellants moved into their newly purchased home and took up residence. However, within a short time they were joined by a man and woman who lived in the home with appellants for a time. The man moved out in May of 1972 and the woman in January of 1975.

This lawsuit was instituted on November 17, 1972. The judgment of the trial court would not only enjoin the appellants from allowing one not a member of the "family" from residing in the home but would oust one of the tenants in common from enjoying his own home.

On appeal the appellants raise several points, but the one I believe decisive is that the trial court erred in enjoining them from residing together or with any other person unrelated to them by blood, marriage or adoption at their home because the trial court's definition of the term "family" is more "confining and restrictive than accepted definitions of the community, definitions from prior decisions of Missouri Courts, or ordinary and common meanings found in American Dictionaries."

Since *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976) review of judgments in court-tried cases is limited, and the decree or judgment of the trial court will be sustained on appeal unless (1) there is no substantial evidence to support it, (2) unless it is against the weight of the evidence, (3) unless it erroneously declares the law, or (4) unless it erroneously applies the law, and appellate courts should exercise the power to set aside a decree or judgment on the ground that it is against the weight of the evidence with caution and with a firm belief that the decree or judgment is wrong. It is in this spirit that I humbly review the decree of an able and experienced trial judge.

In an effort to discern the intention of the "restrictors" here a thorough study of the Indenture in its entirety has been made, and the conclusion is inescapable, I believe,

that what these "restrictors" intended by the Indenture was to develop a subdivision "residential" in character and, except in the few lots specifically excluded from this particular restriction, prohibit the erection of multi-family buildings and the use of any building already erected from multi-family use, as well as the erection or use of any buildings for business or commercial purposes other than professional practice by doctors and dentists residing in the subdivision.

There is no evidence from which the trial court could conclude that these appellants were in violation of these parts of the Indenture. They were using their residential building for a residence inasmuch as they were dwelling therein. Although the Indenture itself recites that the lots platted on the plat recorded in the Office of the Recorder of Deeds of St. Louis County "are all intended as sites for residences only" and are designated "residence lots" and that they have a "general plan to make of said subdivision a desirable residence section," nowhere did they define the term "residence." If the trial judge was to glean their intent from the use of the term "residence" alone as it is used in the Indenture, then any kind of building devoted exclusively to "residence purposes," whether single family dwelling, duplex, flat or apartment building could have been erected on any one of the residential lots except for other restrictions contained in the Indenture. The term "residence" is no term of art; it means a dwelling place. *Shepherd v. State*, supra. Nor is there any evidence that appellants were using their home as a "flat" or an "apartment house." The term "flat," when used in a restrictive covenant, has been construed to mean a house used by more than one family, each family living by itself on different floors and equipped separately for housekeeping. *Godfrey v. Hampton*, 148 Mo.App. 157, 127 S.W. 626, 628[3] (1910). An apartment house, as distinguished from a single family dwelling or flat, is occupied by a number of separate residential suites, more than two, the tenants occupy separate living areas, and usually enjoy certain conveniences such as

heat, elevator service, etc., furnished in common. *Evans v. Roth*, 356 Mo. 237, 201 S.W.2d 357, 364 (banc 1947). It is the separate, independent and disconnected nature of the individual suites within the residential building which distinguishes flats and apartment houses from single family dwellings.

The question to be answered is whether these appellants were in violation of the Indenture because their home was being used by more than one family.

The term "family" is not defined in the Indenture. While at first blush the term "family" would appear easy of definition, the courts have not found it so. Dictionaries have been no more certain. See Webster's Third New International Dictionary wherein there are seven groupings of definition of this simple term. The flexibility of the term has been recognized by the courts of Missouri. In *State ex rel. Kemp v. Arnold*, 234 Mo.App. 154, 113 S.W.2d 143, 145[1] (1938) the court said:

"Now the word 'family,' as it is employed generally in legal terminology, is one of great flexibility, and capable of many different meanings according to the connection in which it is used. *In a narrow and restricted sense it includes only husband and wife and their children, but as commonly understood it is not so limited in its application, and unless the context in which it is used manifests a different intention, it is usually to be construed in its broad and primary sense as a collective body of persons living together in one home, in a permanent and domestic character under one head or management.*" (Emphasis supplied).

For other cases taking cognizance of the flexibility of the term "family" see those cited in *State ex rel Ellis v. Liddle*, 520 S.W.2d 644, 650 (Mo.App.1975). Although I concur in the refusal of the majority to consider in the disposition of this appeal the ordinance of the City of University City attached to the appellant's brief, it is but one example of the numerous municipal ordinances which take cognizance of the fact that the term "family" should be em-

ployed in its broadest and primary sense and not limited solely to persons related by blood or marriage or adoption where restrictions on the use of property are imposed by a legislative body.

While I have no quarrel with the authorities cited in support of the majority opinion, I do not believe that they are controlling here. In not a single case cited by the majority did the court undertake to oust from occupancy the owner of the premises. In *Pierce v. St. Louis Union Trust Company*, 311 Mo. 262, 278 S.W. 398 (1925) it was not the Trust Company which was ousted from its home; rather, both the Trust Company and its lessee were enjoined from operating, or permitting the operation of, a hospital for the care of incurables in a residential area. In the companion case, *Pierce v. Harper*, 311 Mo. 301, 278 S.W. 410 (1925) the operation of a boarding-house in violation of the restrictive covenant was enjoined. Here again the owner or owners of the residence were not ousted.

*Cash v. Catholic Diocese of Kansas City–St. Joseph*, 414 S.W.2d 346 (Mo.App.1967) did not define the term "family" other than by a rhetorical question which the trial court, itself, answered by stating that *it* would not think that *most people* would describe a group of nuns living in the "convent" to be "a family." The real issue in that case was whether the "convent" proposed for construction would meet the zoning classification of a "single family dwelling." The plans for the building showed that it would contain 6000 square feet of floor space, and would be a two-story building containing 13 bedrooms, plus large central bath and toilet facilities, an office, a chapel, a community room, a parlor, a dining room, kitchen, pantry and storage facilities, plus additional laundry, storage and recreational facilities in the basement. The trial judge in his "Reasons for Decision," which was adopted by the Commissioner writing the opinion for the court, said that the basis for his decision was that the residence for nuns could not be described as a single family dwelling because "there are common words that describe such a building without resort to a word that has another widely accepted meaning—"a convent." He equated the group living in the convent—some 9 to 11 nuns—with a boarding-house, sorority or club. We have here no more than 4 people and no evidence whatsoever relative to the residential features of the house which, structurally at least, would make it other than a "single family dwelling."

Read in its entirety, sub-paragraph 2 of Clause E of the Indenture evidences an intent to restrict the erection and usage of residences in the subdivision to single dwelling private residences to be used by not more than one family. No multi-family residences were to be allowed. However, the word family as employed is ambiguous and can be construed "in its broad and primary sense as a collective body of persons living together in one home, in a permanent and domestic character under one head or management," *State ex rel Kemp v. Arnold*, supra, without departing from the general rules of construction applicable to restrictive covenants which hamper the free use of land. To construe the term "family" as the trial court and the majority of this court do—i. e. as limited to *persons related by blood, marriage or adoption* could lead to the preposterous situation where no single, unmarried person might occupy a residence in Ames Place subdivision even though he owned the residence, because, by the definition of family used by the trial court and the majority opinion, he would not comprise a family within the terms of the Indenture.

I would construe the term in its broad and primary sense so as to permit the free use of the defendants' property and would not, as I conceive the majority opinion has done, construe the term more restrictively than the "restrictors" themselves saw fit to do when they had the Indenture drafted. Construing the term "family" as I would requires that this cause be remanded to the trial court for the taking of further evidence and thereby enable the trial court to make a finding whether the appellants occupy the residence as "a collective body of persons living together in one home, in a permanent and domestic character under one head or management."

This approach is most appropriate here because these appellants are the owners of record of this residence and their right to enjoy their property should be protected where possible. The strict enforcement of restrictive covenants is not always the proper remedy for alleged objectionable uses of residential property and I believe this is one of those cases, assuming that the narrow and restrictive definition of "family" is proper, although I do not concede that it is. I would follow the precedent set by *Brady v. Superior Court of San Mateo County*, 200 Cal.App.2d 69, 19 Cal.Rptr. 242 (1962) which held that the use of a house as a *single housekeeping unit* in an area zoned for "single family dwelling" by two students did not constitute a violation of the municipal zoning ordinance restricting the use of houses to "single family dwellings." One of the students was the son of the owner of the house and the other was a friend of the son. The son paid no rent but the friend did, and both paid for the utilities they used. The decisive evidence in the case was that the students did not fractionalize or divide the occupancy into separate segments, but used the kitchen and common facilities as a single unit.

This California case is especially significant in this case in the context of the limited facts presented to the trial court and upon which the trial court based its decree. The California Appeals Court recognized that the interest of the owner of the house—the use of his house—was an important one; "a matter that touches more than a technical interpretation of contract." The California Court in construing the term "single family dwelling" said, 19 Cal.Rptr. l.c. 247:

" 'Single family dwelling' designates the joint occupancy and use of the dwelling by all of those who live there. The word 'single' precludes the segregation of certain portions or rooms for rental. It forecloses *multiple* occupancy of certain portions of the unit for rental as a segregated part, or parts, of the unit. 'Dwelling' means the whole of the premises used for living purposes. It must include the use of the common rooms, such as the kitchen, dining room, living room, if any, by all occupants. It refers to, and reinforces, the concept of singular use, as opposed to multiple. The 'dwelling' cannot be fragmentized into broken bits of housing for rental return.

'family' signifies living as a family; it inhibits the breaking up of the premises into segregated units. It does not necessarily compel the use of the unit by more than one person. We cannot conceive that Atherton meant to prohibit the occupancy of the unit by a single individual homeowner. The word must then, instead, refer to the *use* of the premises as a family, or in the manner of a family. Such family use, again, would, and must be, a single and common use of the premises."

Construed in this light a single person might use the residence "in the manner of a family" and two persons of equal status might occupy and use the premises in the same manner. The court also recognized that if more than one person does occupy the premises, the parties must live together in the same relationship or manner of a family, and the relationship could not be an organizational one, such as that of a social club, sorority or fraternity, which rests upon a social bond rather than a family status.

The court also concluded that the term "single family dwelling" as used in the ordinance modified both *use* and *erection* of a dwelling, and carried the same meaning in both situations; that the erection or construction of a "single family dwelling," in itself, would imply that any building so constructed would contain a central kitchen, dining room, living room and bedrooms and would constitute a single housekeeping unit, and to qualify as a "single family dwelling," an erected structure need only be used as a single housekeeping unit. The evidence proved that the two students used the house as a single housekeeping unit and they did not divide or fractionalize the occupancy into separate segments.

Because the law favors the free use of one's property, and applying the general rules of construction applicable to restrictive covenants to the Indenture for Ames Place subdivision, where one of two or more constructions are available and will not do violence to the intent of the "restrictors," I would employ the term "family" in "its broad and primary sense as a collective body of persons living together in one home, in a permanent and domestic character under one head or management." *State ex rel Kemp v. Arnold*, supra.

Further support for this resolution of this case is found in *State ex rel Ellis v. Liddle*, supra, which involved the question whether the use of a dwelling in an area zoned for single family dwellings for an "Achievement Place," i. e. a home for up to ten juvenile boys under the direction of a husband and wife team of counselors, was in violation of the zoning ordinance. The ordinance defined the term "Family" as follows:

> "One or more persons related by blood, marriage or adoption living together in *one dwelling unit* and maintaining a common household, including domestic servants, gratuitous guests, boarders, roomers or lodgers, but not to exceed 10 persons when all are not related by blood, marriage or adoption."

The court recognized that: "As a vital element toward the resolution of this problem it must be determined if the occupants of the property under the intended *use* would constitute a 'family' within the definition of that term under the zoning ordinance *or under the decisional or common law.*" (Emphasis supplied)

Lest there be some effort to distinguish the holding in *State ex rel. Ellis v. Liddle*, supra, from this case on any basis, I would point out that the court there took cognizance of the two separate categories "family" was divided into by the ordinance. The first category was persons related by blood, marriage or adoption living together "*in one dwelling unit*" in a "*common household*" including *servants, guests, boarders, roomers or lodgers*. There was no maximum number of persons in this category of persons who would comprise a family. The second category was persons unrelated by blood, marriage or adoption, but this category could not exceed 10 persons in *any one dwelling unit.* According to the court, 520 S.W.2d, l.c. 650, this categorization of persons who could reside together in an area zoned for "single family dwellings" simply adopts the common law and decisional broad definition of "family."

For these reasons, I would reverse and remand this case to the trial court so that upon a new trial the parties would be afforded an opportunity to adduce evidence sufficient to enable the trial court to ascertain whether these appellants are in violation of the Indenture, and, in deciding this, I would direct the trial court to employ as its measuring stick the broad primary definition of the term "family" rather than the narrow and restricted definition employed in the first trial.