**STATE of Missouri at the relation of John D. ELLIS et al., Appellants,**

**v.**

**James D. LIDDLE et al., Respondents,**

**v.**

**NORTHWEST MISSOURI JUVENILE COUNCIL, INC., a corporation, Intervenor-Respondent.**

**No. KCD 26803.**

Missouri Court of Appeals, Kansas City District.

March 3, 1975.

Bernard W. Gorman, Tarkio, for appellants.

Dick Thomson, Maryville, for respondents.

Larry L. Zahnd, Zahnd & Whan, Maryville, for intervenor-respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

This proceeding involves Zoning Ordinance No. 3142 of the City of Maryville, Missouri as the same applies to certain residential property located at 210 East Edwards Street in that city. The controversy initially arose by reason of a written opinion of the City Manager of Maryville, David E. Warren, that such property could be used for the establishment of an "Achieve-ment Place" for juvenile boys, under the zoning classification of R–2 covering "single family dwellings".

The relators-appellants, residents of the area and hereinafter called "Protestors", filed an appeal from this opinion of the City Manager to the Board of Zoning Adjustment of Maryville, hereinafter referred to as "Board". After proper notice, a full evidentiary hearing was had before the Board on December 19, 1972. At the conclusion of this hearing, the Board unanimously held that the proposed use of the property was legitimately within the R–2 classification and thus sustained the view of the City Manager.

The Protestors thereupon applied for certiorari in the Circuit Court of Nodaway County and the writ was issued. The Intervenor-Respondent, Northwest Missouri Juvenile Council, hereinafter referred to as "Council" was permitted to intervene in the certiorari proceedings. The case was submitted to the Circuit Court upon the pleadings and the transcript of the evi-ence before the Board and no further evidence was received. The defendants in that proceeding and respondents here are the chairman and members of the Board. The Circuit Court affirmed the findings and order of the Board and this appeal followed.

It should be noted at the outset that this matter did not initially stem from the Council's application for a rezoning or special use permit with reference to the intended use of the property involved, as is the usual case in such matters. The City Manager stated that no such rezoning or permit was required since the property was already being used as a single family residence under R–2 of the Zoning Ordinance when it was acquired by the Council. The matter arose before the Board by reason of an appeal from the City Manager's determination (in which the Building Inspector of Maryville apparently concurred) that the intended use by the Council did no violence to the R–2 classification of the ordi-

nance. The Board, the Protestors, and the Council, all treated the matter, however, as a request by the Council for the intended use, on the one hand, and the objection to such use by the Protestors on the other hand. No objection was voiced by any of the parties as to the procedures, the legal status or jurisdiction of the Board, the qualifications of the Protestors or the status of the Council either before the Board or the Circuit Court. Nor is such point raised in this court. The matter will therefore be treated here as the usual appeal from a statutory certiorari proceeding in such zoning matters.

It should be further noted that at the time of the initiation of this proceeding the Council had acquired the property at 210 East Edwards Street, Maryville, Missouri, but had taken no further steps to implement the establishment of its intended use as an "Achievement Place".

Review in such zoning matters is limited in scope. Neither the Circuit Court nor this court can try this case *de novo* or substitute its judgment for that of the Board. Review is limited to a determination of whether the ruling of the Board is authorized by law and is supported by competent and substantial evidence upon the whole record. If the ruling of the Board is supported by substantial evidence and the result reached is reasonable the courts are without authority to disturb the finding unless it is clearly contrary to the overwhelming weight of the evidence. Article V, Section 22, Constitution of Missouri, V.A.M.S.; Rosedale-Skinker Improvement Association v. Board of Adjustment, 425 S.W.2d 929 [8] (Mo. banc 1968); Stockwell v. Board of Zoning Adjustment of Kansas City, 434 S.W.2d 785, 789 [1, 2, 3] (Mo.App.1968); Shiverdecker v. Zoning Board of Adjustment of Fulton, 351 S.W.2d 43, 46 [1, 2] (Mo.App.1961); State ex rel. Nigro v. Kansas City, 325 Mo. 95, 27 S.W.2d 1030, 1033 [5, 6] (banc 1930); Brown v. Beuc, 384 S.W.2d 845,

850–851 [2, 3] (Mo.App.1964). These limitations upon the scope of judicial review of matters related to zoning stem from the fact that the exercise of the right to control the use of property is basically and historically a legislative exercise of police power by the sovereign. Such power, however, may be delegated to lesser governing bodies, such as municipalities. State ex rel. Sims v. Eckhardt, 322 S.W.2d 903, 906 [2, 3] (Mo.1959); Allen v. Coffel, 488 S.W.2d 671, 678 [7, 8] (Mo.App.1972); County of Platte et al. v. Chipman, Trustee (State ex rel. White et al. v. County Court of Platte County, 512 S.W.2d 199, 202 (Mo.App.1974). Such a grant of sovereign power has been made by the State of Missouri to Maryville, Missouri in Sections 89.010–89.140 RSMo 1969, V.A.M.S.

The issues on this appeal for judicial decision under the foregoing principles are well defined and may be simply stated. Protestors assert that the Council's intended use of the residential property at 210 East Edwards Street, Maryville, Missouri, is not within the uses permitted under the R–2 classification of "single family residence" in that the use is in fact and law not a single family residence but a penal or detention facility for wards of the juvenile court (a use admittedly not contemplated or permitted under R–2). On the other hand, the Board and the Council assert that the intended use is in both law and fact a use contemplated by the R–2 classification of the zoning ordinance, a position adopted by both the Board and the Circuit Court below. While thus simply stated, the solution of the problem is complex. A decision must be reached as to whether such use is "authorized by law" and if there is "substantial evidence" to bring such use within the authority and terms of the Zoning Ordinance.

The pertinent portions of Zoning Ordinance No. 3142 of the City of Maryville are as follows:

"*Section-1315* R–2 Single family residence. 6,600 Square Foot Zone. Pro-

vides for single family residences on moderate sized lots.

\*   \*   \*   \*   \*   \*

*Section-1600* DEFINITIONS: For the purpose of this ordinance certain words and terms used herein shall be defined and interpreted as follows:

\*   \*   \*   \*   \*   \*

*Section 1620* DWELLING: A building or portion thereof, designed or used exclusively for residential occupancy, including single family dwellings \* \* \* and group dwellings; \* \* \*

\*   \*   \*   \*   \*   \*

*Section 1624* DWELLING, SINGLE FAMILY: A building containing one dwelling unit only.

\*   \*   \*   \*   \*   \*

*Section 1629* FAMILY: One or more persons related by blood, marriage or adoption living together in one dwelling unit and maintaining a common household, including domestic servants, gratuitous guests, boarders, roomers or lodgers, but not to exceed 10 persons when all are not related by blood, marriage, or adoption.

\*   \*   \*   \*   \*   \* "

There is no dispute but that the property at 210 East Edwards Street was constructed as a residence and has existed as such for many years. The undisputed evidence of the Council is that the contemplated use will keep such property structurally substantially the same and that it will not be converted into apartments or other commercial type of structure which would destroy its present basic characteristics as a single family residence.

As stated above, the controversy is thus narrowed to the single overriding issue of whether or not there is substantial evidence of the intended use to bring such use within the zoning ordinance definition of a "single family residence" and is therefore "authorized by law" or is the intended use to be that of a penal institution, detention facility, jail or prison, and thus unauthor-

ized by law under the R–2 classification of the zoning ordinance. As a vital element toward the resolution of this problem it must be determined if the occupants of said property under the intended use would constitute a "family" within the definition of that term under the zoning ordinance or under the decisional or common law.

The resolution of this therefore requires at least a summary of the evidence presented as to the Council's intended use of the property.

The Council is a not-for-profit corporation organized under applicable Missouri law. Its Articles of Incorporation state its purposes as follows:

"5. The purposes for which the Corporation is organized are: To acquire, operate, manage and maintain a home or homes for youths under the jurisdiction of the juvenile courts of the Fourth Judicial Circuit of Missouri, who are in need of the same and whose parents are deceased, unable or unwilling to provide a suitable and proper home for them; in order that the highest aspirations and potential of the juveniles in the Fourth Judicial Circuit of Missouri may be realized; to cooperate with all other social and welfare groups and agencies in fostering the best interests of the youths selected for residence in said home or homes; and to do all necessary things to carry out such purposes."

David E. Warren, City Manager of Maryville, testified that he reaffirmed his opinion as contained in his letter of November 15, 1972, that so long as the total number of unrelated persons occupying said property did not exceed 10, that such came within permissible use under R–2 and the ordinance definition of "family" as contained in such ordinance; that he had examined Council's application for funding to the Northwest Missouri Law Enforcement Assistance Council; had viewed a film of "Achievement Place" operation based upon the model of such facilities at

the University of Kansas shown by Reverend Gil Peters to the Lions Club at Maryville; that he had discussed this project with Reverend Peters; and, that it was his opinion that such use was permitted under R–2 classification and that no formal application was required for such use. Dale Florea, City Building Inspector of Maryville, agreed with Warren.

Greg Chamberlain, the Chief Juvenile Officer for the 4th Judicial Circuit of Missouri and familiar with the proposed operation of Achievement Place, stated that the candidates for entrance to such facility would be either juvenile law violators or neglected children under his jurisdiction; that the selection of these boys would be initially up to the Juvenile Judge's discretion after investigations by the Missouri Department of Welfare, the Department of Mental Health and the Department of Education; that such candidates for admission would have to be approved by an admissions or acceptance committee of the Council; that Achievement Place would be licensed by the Division of Welfare as are foster homes for children under the jurisdiction of the juvenile court; that the rules and regulations under which the children would live would be set up by the Council under guidelines established at the University of Kansas; that they would attend public schools, have assigned work responsibilities, would earn points under a merit system and would function as a family-type group with the end goal of rehabilitation and integration into community life.

He further testified that the boys would be under the direct supervision of a man and wife who would have college degrees with post graduate work in the behavior modification sciences.

He further testified that the acceptability of a boy for Achievement Place would ultimately be determined by a committee composed of a representative of the juvenile court, one from the Division of Welfare, one from the school system, the two

teaching parents, and a lay person. Those accepted would be committed by the juvenile court to the care, custody and control of the Division of Welfare of Missouri.

Chamberlain further stated that on an average there are 26 children subject to such help each year in the 4th Judicial Circuit, of which an average of 16 are neglected children and 10 are law violators. Some of these are now placed in the Missouri Baptist Children's Home and like facilities and in foster homes. Most of them, he stated, were eventually returned to their own homes. He stated that from July, 1970 to January, 1971, 12 girls and 13 boys from ages 11 to 16 years were placed in foster homes.

The Reverend Gilbert R. Peters, president and chairman of the Board of the Council, testified as to its corporate not-for-profit character; that the goal was to establish a board of 13 members with 5 from Nodaway County and 2 from each of the other 4 counties in the 4th Judicial Circuit.

The goal of the Council was to establish a foster family-style home for 6 to 8 boys, 12 to 16 years of age, modeled on the Achievement Place at Lawrence, Kansas. The teaching parents would be husband and wife who may or may not have children of their own. They would each be required to have college degrees and postgraduate work or training. Reverend Peters stated that the Council was firmly committed that there would not be more than 10 persons resident in Achievement Place.

He testified as to the composition of the intake or acceptance committee as stated by Juvenile Officer Chamberlain and stated that the basic qualification for admission for the boys was that they be 12 to 16 years of age, that they have no behavior patterns which would endanger others, no profound mental or physical handicaps, be eligible for admission to public schools, have been declared dependent, neglected or delinquent by the juvenile court and committed to the Achievement Place by the

County Department of Social Welfare for an indefinite period. The screening process for admittance will be careful and detailed and some boys will be accepted and some not.

The intended program includes enrollment and attendance at public schools, to which the boys will go unattended. Each boy will be assigned specific work duties around the home and can earn privileges through accomplishments. Games and sports and Boy Scout work are encouraged. Suitable outside employment is permitted. Visits to the home to see his natural parents over weekends can be allowed, and as are visits by the natural parents to Achievement Place. The teaching parents at Achievement Place will work closely with the natural parents in appropriate situations where such would tend to adjustment of any parent-child problems. The overall objective will be to equip each boy to integrate into normal society and to become useful citizens under normal family-style home environment.

Achievement Place has been approved and will be licensed by the State Division of Welfare and funded by private donations and grants from the Missouri Law Enforcement Assistance Council, with a starting budget of $43,833.00.

Mrs. Nelson Grabau, one of the organizers of the Council and who also had served as Secretary, testified that in March, 1971, she spent a week in Lawrence, Kansas studying the operation there of the model Achievement Place which had been in operation since 1967. She confirmed the proposed programs as outlined by Reverend Peters and stated that Achievement Place was definitely not a "jail situation". Statistics had shown that so far as juvenile law violators exposed to the program, the rate of recidivism was much lower than where boys were confined in training schools, penal institutions or on probation.

Of the nineteen Protestors, only three testified, J. D. Ellis, Thomas R. Hooper and Geraldine Campbell, all of whom were residents in the neighborhood of 210 East Edwards Street.

J. D. Ellis testified that he had lived within 50–100 feet of the property in question for 26 years; that 210 E. Edwards had been a dwelling house during all of that time; that it was a two-family duplex before sale to the Council; that he had received no formal notice of the sale or of the city manager's written opinion; that some residents of the area did not join in the protest, and that he had no personal knowledge as to the operation of Achievement Places.

Thomas Hooper testified that he lived at 121 East Edwards; that he operated a real estate business from his home and had a sign in his yard "Real Estate for Sale"; that he had received no notice of the sale of the property here involved; and that he had no first hand knowledge of the Achievement Place operations.

Geraldine Campbell testified she lived two blocks north of the property here involved and that she had received no official notice of the sale nor of the intended Achievement Place use.

None of these persons testified as to any specific objections they had nor of any fact or opinion as to how the Achievement Place would damage or otherwise interfere with them or the enjoyment and use of their properties.

■ Since the zoning ordinance is in fact a legislative exercise of the delegated police power, its wording must initially be given an "ordinary, plain and natural" meaning, Suburbia Gardens Nursery, Inc. v. County of St. Louis, 377 S.W.2d 266, 271[3] (Mo. banc 1964); Hasekamp v. Superior Equipment Co., Inc., 490 S.W.2d 385, 383[3] (Mo.App.1973), so that the legislative intent may be ascertained. In the absence of any ambiguity, such meaning must be applied to the facts of this case as above summarized.

No ambiguity exists in the sections of Zoning Ordinance No. 3142 applicable here. Section 1315 covering R–2 classification clearly covers only "single family residences". Standing alone, the legislative intent by the use of the term "family" might be considered obscure or at least susceptible to different interpretations. However, the ordinance clearly and unequivocally defines the legislative meaning of the R–2 classification of Section 1315 of "single family residence".

■ Section 1620 defines "dwelling" as a building "designed or used exclusively for residential occupancy, including single family dwellings * * * and group dwellings". Section 1624 defines "dwelling, single family" as a "building containing one dwelling unit only". Clearly the evidence in this record qualifies the property at 210 East Edwards Street under these definitions, with no room for argument.

Section 1629 defines the word "family" in two distinct categories. *First,* "one or more persons related by blood, marriage, or adoption living together in one dwelling unit" in a "common household" including servants, guests, boarders, roomers or lodgers. The ordinance places no limitation on the number of such persons occupying the dwelling unit. *Second,* persons "not related by blood, marriage, or adoption". Such occupancy may not exceed 10 persons in any one dwelling unit.

■ These sections of Ordinance 3142 when read together clearly authorize the proposed "family" use for Achievement Place, although the persons involved (except for the teaching parents and any of their children) will not be related by blood, marriage, or adoption so long as the total number of residents does not exceed 10 persons.

This ordinance simply adopts the common law and decisional broad definition of "family". While the briefs and independent research have not disclosed any Missouri decision interpreting a zoning ordinance of the nature here involved, the meaning to be ascribed to the term "family" has frequently arisen in estate matters and none of these decisions limit the use of such term to include only persons related by blood, marriage, or adoption.

As was stated in Steva v. Steva, 332 S.W.2d 924, 926[4] (Mo.1960) :

"[T]he term 'family' * * * 'has been defined as a collective body of persons under one head and one domestic government, who have reciprocal, natural, or moral duties to support and care for each other'. * * *"

In State ex rel. Kemp v. Arnold, 234 Mo.App. 154, 113 S.W.2d 143, 145 [1] (1938), the court said:

"Now the word 'family,' as it is employed generally in legal terminology, is one of great flexibility, and capable of many different meanings according to the connection in which it is used. In a narrow and restricted sense it includes only husband and wife and their children, but as commonly understood it is not so limited in its application, and, unless the context in which it is used manifests a different intention, it is usually to be construed in its broad and primary sense as a collective body of persons living together in one home, in a permanent and domestic character, under one head or management. * * *"

See also: Dalton v. Poinsett, 164 S.W.2d 124, 128 [3] (Mo.App.1942) ; Smith v. Estate of Sypret, 421 S.W.2d 9, 14 [3] (Mo. 1967) ; Embry v. Estate of Martz, 377 S.W.2d 367, 370 [1] (Mo.1964).

The broad definition of the term "family", adopted by Missouri courts in the cases above referred to, has been applied to zoning laws similar to the ordinance here involved in many other jurisdictions. Anderson, American Law of Zoning, Vol. 1,

Sections 8.27–8.30, pp. 635–643; Vol. 2, Section 9.15, pp. 140, 142; Vol. 2, Section 12.11, pp. 507–508; Neptune Park Association v. Steinberg, 138 Conn. 357, 84 A.2d 687 (1951); City of Des Plaines v. Trottner, 34 Ill.2d 432, 216 N.E.2d 116 (1966); Application of La Porte, 2 A.D.2d 710, 152 N.Y.S.2d 916, aff'd 2 N.Y.2d 921, 161 N.Y.S.2d 886, 141 N.E.2d 917; Women's Kansas City St. Andrew Society v. Kansas City, Mo., 58 F.2d 593 (CCA 8–1932).

It is thus clear that both under the specific terms of the ordinance and under the common law the operation of Achievement Place as intended does no violence to the R–2 classification so far as the "single family residence" requirement is concerned. But the appellants strongly assert that the proposed use of the property is not that of a family residence but rather a detention or penal institution, a use which City Manager Warren admitted would not come within the R–2 classification. The record does not support this position.

The overwhelming evidence in this record supports the statement of Mrs. Nelson Grabau that the operations of Achievement Place modeled upon the University of Kansas project do not present "a jail situation". The boys who enter the project are carefully screened and will include neglected or abandoned boys (in all likelihood a majority) as well as some who are under the jurisdiction of the juvenile court for other reasons, but subject to rehabilitative training. They will live in a family-style environment without physical restraint except for the assignment of family responsibilities, public school attendance, and other programs detailed in the testimony. The physical property at 210 East Edwards will remain intact as a residence and there was a complete absence of any evidence that the intended use would destroy or even change the "essential character" of the neighborhood or the property of the Protestors. Such conclusion was peculiarly within the competence of the members of the Board and by unanimous vote they

rejected the protest that the intended use was in fact that of a detention, jail or like facility.

The Achievement Place project is a salutory one in complete harmony with the public policy of this state as expressed by statutory law. The purpose of our juvenile code is stated in Section 211.011 RSMo 1969, V.A.M.S., in clear and definite terms:

"Purpose of law—how construed

The purpose of sections 211.011 to 211.431 is to facilitate the care, protection and discipline of children who come within the jurisdiction of the juvenile court. Sections 211.011 to 211.431 shall be liberally construed, therefore, to the end that each child coming within the jurisdiction of the juvenile court shall receive such care, guidance and control, preferably in his own home, as will conduce to the child's welfare and the best interests of the state and that when such child is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to that which should have been given him by them."

In keeping with this purpose, the Legislature has frequently stated public concern for the welfare of juveniles. Chapter 210 RSMo 1969, V.A.M.S., Child Protection and Reformation; Sections 210.110–210.190 RSMo 1969, V.A.M.S., Guardianship of Children by Division of Welfare; Section 210.200–210.245, RSMo 1969, V.A.M.S., Licensing of Certain Child Care Homes. To adopt the position of Protestors and their interpretation of Zoning Ordinance No. 3142 in the light of the evidence here presented would be to fly in the face of these declarations of public policy as expressed in these and other statutory enactments.

A case very similar as to both facts and principle is Abbott House v. Village of Tarrytown, 34 A.D.2d 821, 312 N.Y.S.2d 841 (1970). The zoning ordinance of Tar-

rytown defined residential areas in terms of "family" by marriage, blood, or adoption. Non-related groups desiring to occupy a single residence were required to obtain a permit and were limited to a maximum number of five.

Abbott House was a not-for-profit corporation and was an authorized agency under the Social Services Law of New York. It intended to utilize a residential property in Tarrytown to establish "an agency boarding home" as defined under the Social Services Law for the care and training of six neglected and abandoned children under the supervision of the State Board of Social Welfare and under the immediate care of a married couple living with them. The children and the couple would be carefully selected and would be unrelated. The purpose was to create a "family atmosphere" for the children. This home was established and Abbott House was notified it was in violation of the zoning law. It brought a declaratory judgment action and in ruling it was not in violation, the court said:

> "It is clear that this Zoning Ordinance has the effect of totally thwarting the State's policy, as expressed in its Constitution and Social Service Law, of providing for neglected children. We are therefore of the opinion that the Tarrytown Zoning Ordinance, insofar as it conflicts and hinders an overriding State Law and policy favoring the care of neglected and abandoned children, is void as exceeding the authority vested in the Village of Tarrytown. * * *" (1. c. 843)

The above statement in *Abbott House* applies with equal force to the facts in this case.

The ruling of the Board was authorized by law and is supported by competent and substantial evidence upon the whole record and the judgment of the Circuit Court is therefore affirmed.

All concur.