## MAYOR AND CITY COUNCIL OF BALTIMORE v. STATE DEPARTMENT OF HEALTH AND MENTAL HYGIENE, ETC.

[No. 473, September Term, 1977.]

*Decided January 17, 1978.*

The cause was argued before GILBERT, C. J., and MOYLAN and LISS, JJ.

*Richard M. Hartman, Chief City Solicitor,* with whom was *Benjamin L. Brown, City Solicitor,* on the brief, for appellant.

*Jack C. Tranter, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

This Court, in *Youngstown Cartage Co. v. N. Point Peninsula Community Co-Ordinating Council,* 24 Md. App. 624, 628, 332 A. 2d 718, 720 (1975), found it unnecessary to decide whether a municipality had authority to zone land "owned and used by the State." We pointed out that "[t]he question of a county's right to zone" such land "does not appear to have been decided thus far in Maryland." 24 Md. App. at 628, n. 4, 332 A. 2d at 720. Subsequently, the Court of Appeals, in *Mayor of Baltimore v. State,* 281 Md. 217, 378 A. 2d 1326 (1977), came firmly to grip with the problem. The Court, speaking through Judge Eldridge, held that "since the General Assembly has neither named the State nor manifested an intention that the State be bound in the provisions of the Zoning Enabling Act, *Baltimore City has no authority to subject the State's use of the Continental Can property to its zoning ordinance.*" (Footnote omitted.) (Emphasis supplied.) We read that language to mean that

when the State uses its property for State purposes, municipal zoning laws are not applicable to the use. Left unanswered by *Mayor of Baltimore v. State, supra,* is the question: What effect does the municipal zoning ordinance have on State-owned property that is leased to another for private purposes or for public purposes?

We, in *Youngstown,* made clear that we did not share the view espoused in two New Jersey cases, *Aviation Servs., Inc. v. Bd. of Adjustment,* 20 N. J. 275, 119 A. 2d 761 (1956); *Hill v. Borough of Collingswood,* 9 N. J. 369, 88 A. 2d 506 (1952), that when a State leases or rents its property to a tenant for the tenant's private venture or purpose, the sovereign's immunity from local zoning laws is transferred to the tenant. 24 Md. App. at 630, 332 A. 2d at 721. Indeed, we expressed our concern that to follow such a practice would be to permit the sovereign to trample willy-nilly over the zoning ordinances of the municipalities to the possible detriment of the public health, safety and general welfare.[1] The Court of Appeals did not reach the issue in *Mayor of Baltimore v. State, supra,* inasmuch as the Continental Can property was not only to be acquired by the State, but was to be used by the State as a penal institution to alleviate the crowded, congested, and combustible conditions existent in the present correctional system.

The situs of the controversy out of which this case has arisen occurred at almost the opposite end of the City from the Continental Can location. The matter now before us had its origin as a result of the creation of the State Department of Juvenile Services (DJS) as a part of the Department of Health and Mental Hygiene. 1969 Md. Laws, ch. 77, § 25. By the legislative mandate of what is now known as Md. Ann. Code art. 52A, § 5, the DJS was charged with developing "programs for the *predelinquent child*[2] whose behavior tends

1. Such a situation would be deplorable. Imagine the hypothetical situation wherein the State acquires a tract of land in a highly desirable residential area of the city and then leases it to a tannery or a slaughter house. The effect on the surrounding area would be devastating.

2. The term "predelinquent child" is not defined. Patently, it can refer to *all* children under the age of eighteen (18) years who have not been adjudicated delinquent, and would include *a child in need of supervision* (CINS) as that term is defined in Md. Cts. & Jud. Proc. Code Ann. § 3-801 (f).

to lead to contact with law-enforcement agencies." (Emphasis supplied.)

Apparently, as a part of its program, DJS acquired the property known as 3119 Ferndale Avenue in the Howard Park area of Baltimore City. DJS then rented the property to the Camp Fire Girls Council of the Chesapeake, Inc., (CFG), a private, non-profit, charitable organization. The rental agreement was a month-to-month tenancy. It is clear from the record, however, that if and when this litigation is final, the parties will enter into a lease for a longer period of time. The purpose of the agreement between the DJS and CFG was to provide a home for six (6) teenage girls between the ages of fifteen (15) and eighteen (18). The girls have all been committed by the Juvenile Court of Baltimore City to the jurisdiction of the DJS as "children in need of supervision" (CINS). According to Md. Cts. & Jud. Proc. Code Ann. § 3-801 (f), a CINS child is one "who requires guidance, treatment, or rehabilitation because

(1) He is required by law to attend school and is habitually truant; or

(2) He is habitually disobedient, ungovernable, and beyond the control of the person having custody of him without substantial fault on the part of that person; or

(3) He deports himself so as to injure or endanger himself or others; or

(4) He has committed an offense applicable only to children."

A CINS child is not a delinquent child. *See* Md. Cts. & Jud. Proc. Code Ann. § 3-801 (1) for the definition of a delinquent child.

On October 21, 1976, a permit was issued to the DJS by the Department of Housing and Community Development of Baltimore City. The permit manifests that it is for "Campfire New Day Home" and authorized DJS to house "one family and no more than six (6) children" at the Ferndale Avenue site. Within the "reasonable time" prescribed by The Zoning Ordinance of Baltimore City, Ord. 1051, § 11.0-3 j1 (1971), what is described as a "negative appeal" was taken to the

Board of Municipal and Zoning Appeals to "prohibit the use of 3119 Ferndale Avenue for a home for Delinquent Girls as proposed by the State."

The appeal was heard before the Board on December 7, 1976. The same day the Board, being of the opinion that the home was "simply an institution for the care of delinquent children or girls," found that the use "would have an obviously adverse effect, not only on this community, but on any neighborhood in the City." [3] The Board concluded that the "permit was issued in error," and "would menace and endanger the public health, security, general welfare and morals." The action of the Zoning Administrator in issuing the permit was disapproved. In short, the permit was revoked. The State appealed to the Baltimore City Court.[4]

In that tribunal, Judge Martin B. Greenfeld correctly pointed out that contrary to the Board's finding, CINS children are not "delinquents," to which we add that they should not be so characterized. The Board's revocation of the permit was in turn reversed by the court on the ground that the purpose of the use of the State-owned house was a public purpose and that the Board had no jurisdiction over the issuance of the permit in the first instance.[5]

The City has now appealed to this Court and asks us to reverse the order entered by Judge Greenfeld and to reinstate the Board's finding. We shall not, because we are in accord with Judge Greenfeld.

At the outset, we made manifest that the law is that a municipality may not exercise zoning jurisdiction over State-owned and used property unless the State has subjected itself to the authority of the municipality. *Mayor of Baltimore v. State, supra.*

If the issue before us were one of the State's property being

---

3. Most people recognize that homes are needed for CINS children, but many feel just as the Board obviously felt, that they should be located "someplace else." Chief Judge Desmond, in Von Kohorn v. Morrell, 9 N.Y.2d 27, 34, 172 N.E.2d 287, 289, 210 N.Y.S.2d 525, 528 (1961), cogitatively observed that, "everyone wants churches, schools (and clubs) [and homes for CINS children] but not in his own neighborhood."

4. The Zoning Ordinance of Baltimore City, Ord. 1051, § 11.0-3 1 (1971).

5. It may be that the State would not need a permit unless the use to be made was to a private party for a private use. We do not, however, decide that issue in this case.

leased to a private party for private use, we would have given the matter short shrift because we have already resolved that question in *Youngstown.*

Judge Greenfeld was of the view that the use made of the property in the case *sub judice* was public, and that it served a public purpose. We fully agree.

The Court of Appeals, in *Prince George's County v. Collington Crossroads, Inc.,* 275 Md. 171, 186-90, 339 A. 2d 278, 286-88 (1975), noted that " 'public use' is not synonymous with the physical use or access by the general public." The fact that some private enterprise or person will also benefit from an acquisition via condemnation will not convert the public character to private. Furthermore, that the property, after the taking by way of condemnation, will be "put into private hands does not destroy the public character of the taking insofar as that taking may accomplish a proper public benefit." *Herzinger v. Mayor of Baltimore,* 203 Md. 49, 60, 98 A. 2d 87, 92 (1953).

In *Riden v. Philadelphia, B. & W. R.R.,* 182 Md. 336, 340, 35 A. 2d 99, 101 (1943), it was stated that:

"[T]he Legislature cannot make a use public merely by declaring it so. Whether a particular use for which private property is sought is in fact public is ultimately a question for the determination of the court."

There is no one definition of the phrase "public use" which can be utilized in order to determine whether a specific use is public or private. *Youngstown Cartage Co. v. N. Point Peninsula Community Co-Ordinating Council, supra* at 628, n. 5, 332 A. 2d at 720. *See also Prince George's County v. Collington Crossroads, Inc., supra* at 180-81, 339 A. 2d at 283. We pointed out in *Youngstown,* quoting Ghingher & Ghingher, *A Contemporary Appraisal of Condemnation in Maryland,* 30 Md. L. Rev. 301, 303 (1970), that:

"Maryland has two distinct concepts of public use, both of which are of constitutional dimension: a taking under article III, section 40 [of the Maryland

Constitution] is constitutional only if the property is to be used 'by the public,' while the purpose of the takings authorized by article XI-B is constitutional if it is for the 'public benefit.'"

We further said that the "public benefit test seems to be limited to Land Development and Redevelopment projects such as slum clearance...." 24 Md. App. at 629, 332 A. 2d at 721. Thus, because the property in the instant case is not concerned with land development or redevelopment, we eliminate the "public benefit test" from our consideration.

"Use by the public," as we have previously indicated, is not susceptible to any one single, all-inclusive definition. The term may have different meanings, dependent upon the factual circumstances. In *Youngstown, supra,* we held that the State-owned land, leased to a private enterprise for purely private purposes, was not subject to "public use" because "[t]he public has no right to enter upon *or make use of the ... property* so long as ... [Youngstown] remains a lawful tenant thereof." (Emphasis supplied.) 24 Md. App. at 630, 332 A. 2d at 721.

There are many State-owned facilities where the public, in the sense of the average citizen, has "no right to enter" absent a special permission received from competent authority. Some examples are:

1) Any penal institution in the State, which of necessity, for the protection of the public, the inmates, and the custodians, the public is not free to enter at will upon the property. Specific visiting hours and rules govern entry into the institution, yet the facility is unquestionably "in the public use."

2) A courthouse is open to the public, but certain portions of it are not. The public may enter a courtroom but have no right to burst in upon a jury during its deliberation, yet the jury room is being employed "in the public use."

3) The Comptroller's office is most certainly a public building, and "in the public use," but one

is not free to roam throughout that office. Not only would the daily routine be interrupted by the interloper, but the intruder would be placed in a position of breaching the public trust in the Comptroller's office by his gaining access to confidential individual income tax information.

4) One need but think of the chaotic conditions which could be created by the public's use of all public facilities such as the National Guard Armories' weapons rooms, police headquarters' interrogation rooms, or the record rooms of the Motor Vehicle Administration, and he will realize that "public use" does not mean the right of individual members of the public to enter upon all State-owned property at random.

The DJS is specifically charged by Md. Ann. Code art. 52A, § 11 with establishing, maintaining, and operating "within the annual budgetary appropriations" such "facilities as may be needed properly to diagnose, care for, train, educate, and rehabilitate children in need of these services. . . ." By § 11A of the same article, enacted as 1974 Md. Laws, ch. 788, § 1, the legislative mandate directed to DJS was that it "shall provide for care, diagnosis, training, education, and rehabilitation of children by placement in group homes and institutions operated by nonprofit charitable corporations. . . ."

We think it apparent from the record that the CFG is a "charitable corporation" and that the DJS, in acquiring the property on Ferndale Avenue and renting it to CFG as a "group home" for CINS, is carrying out the will of the General Assembly as manifested by § 11A. We further think that the use made of the Ferndale property is a "public use" in that it is being used by the State for the benefit of the general public in providing to CINS "care, diagnosis, training, education, and rehabilitation." Md. Ann. Code art. 52A, § 11A. Hopefully, such a program will turn a CINS from any desire to pursue errant ways into a responsible and productive member of society.

We hold that the property known as 3119 Ferndale Avenue, while owned by the DJS and utilized in the circumstances of this case, is not subject to the jurisdiction of the Board of Municipal and Zoning Appeals of Baltimore City.

*Order affirmed.*
*Costs to be paid by Mayor and City*
*Council of Baltimore*