## 40623. MACON ASSOCIATION FOR RETARDED CITIZENS v. MACON-BIBB COUNTY PLANNING & ZONING COMMISSION.

MARSHALL, Presiding Justice.

The Macon Association for Retarded Citizens, a nonprofit organization which is governmentally financed, submitted a petition to the Macon-Bibb County Planning and Zoning Commission (the Commission) requesting that the Commission amend its Comprehensive Land Development Resolution for Macon and Bibb County (Resolution) so as to permit homes under the Community Services Act for the Mentally Retarded (Ga. L. 1972, p. 700 et seq.; OCGA § 37-5-1 et seq. (Code Ann. § 99-3301)) in zoning districts in which such usages would otherwise be prohibited. The Commission denied the petition. On writ of certiorari to the superior court, the superior court sustained the Commission's decision. Issues facing the superior court and this court are whether the equal-protection rights of the mentally retarded have been violated and whether the proposed homes for the mentally retarded are exempt from local zoning regulations. The superior court resolved these issues against the petitioner-association. For reasons which follow, we agree and affirm.

Pursuant to a special amendment to the Georgia Constitution (Art. VI, Sec. I, Par. IV of the Ga. Constitution of 1945; Ga. L. 1947, p. 1240), the City of Macon and Bibb County created the Macon-Bibb County Planning and Zoning Commission and vested the Commission with legislative power and authority to exercise planning and zoning for Macon and Bibb County. See *Birdsey v. Wesleyan College,* 211 Ga. 583 (87 SE2d 378) (1955); *Baker v. Macon-Bibb County Planning &c. Comm.,* 118 Ga. App. 686 (165 SE2d 430) (1968). (This distinguishes the Macon-Bibb County Planning and Zoning Commission from other planning commissions established under state statutory law (Code Ann. § 69-1201 et seq.;

Ga. L. 1960, p. 1037, as amended; repealed by Ga. L. 1981, p. 3). The general function of such commissions is to act as an advisory or recommending agency to the legislative department of city or county government. *Royal Atlanta Dev. Corp. v. Staffieri,* 236 Ga. 143, 145 (223 SE2d 128) (1976).

In 1981, the Commission adopted the Resolution dividing Macon and Bibb County into 28 zoning districts in order to, among other things, protect the character of existing neighborhoods, prevent population density in areas not served by adequate government services, and to promote orderly growth and development. Under this Resolution, "permitted" or "conditional" uses of land are established for each zoning district. For a permitted use, a certificate of zoning compliance may be issued by the Zoning and Enforcement Officer without a hearing; however, if the use would impact unfavorably on adjoining property, upon recommendation of the Zoning Enforcement Officer a public hearing may be held thereon and buffer areas and screening may be required. A conditional use is allowed only after the Commission conducts a hearing and enters certain findings to the effect that the proposed use or uses will be: consistent with the general plan for the area, in harmony with the general character of the area, and served by adequate public services. There are also provisions for amending the resolution.

In April of 1983, the petitioner submitted a petition to the Commission requesting that the Resolution be amended so as to permit in single-family residential districts (R-1AAA, R-1AA, R-1A, R-1, R-2A, R-2, R-3) homes under the Community Services Act for the Mentally Retarded with the number of mentally retarded individuals limited to a maximum of five adults with a maximum of two surrogate parents. These homes would be maintained by the Bibb County Board of Health, the Georgia Department of Human Resources, or the United States Department of Housing and Urban Development.

Under § 4.14 of the Resolution, a dwelling unit in such districts may not be occupied by more than one family, and the Resolution states that, "such family may consist of not more than (1) of the following: [1] One (1) person or two (2) or more persons related by blood or marriage, with no more than two (2) roomers or boarders, and with any number of natural children, foster children, stepchildren or adopted children; or [2] a group of not more than four (4) persons not necessarily related by blood or marriage."

The Resolution (§ 1.02 [105]) also provides for "supportive living homes" defined as "A facility non-institutional in character in which is provided room, meals and personal care for 3 to 15 mentally ill adults. These homes are regulated and administered through the

Mental Health Division of the Georgia Department of Human Resources." In addition, the Resolution (§ 1.02 [46]) provides for "group personal care homes," defined as "A home established under the 'Community Services Act for the Mentally Retarded' (Ga. Laws 1972, p. 700) and maintained by the Bibb County Board of Health, the Georgia Department of Human Resources, or the U. S. Department of Housing and Urban Development, with the number of mentally retarded individuals limited to the maximum of fifteen (15) with a minimum of three (3) supervisory personnel." These homes are permitted as a conditional use in R-3 residential districts, as well as in C-2, C-3 and C-4 districts.

Public hearings were held on the petitioner's proposed amendment in May and June of 1983. The petitioner stated that it had obtained an option for construction of two group family homes on a tract of land in Macon located in a single-family residential district, and that grants had also been obtained for construction of these homes. Following the hearings, the application was denied.

The petitioner filed a petition for writ of certiorari in the superior court, contending: (1) The Commission's decision violates the equal-protection rights of mentally retarded individuals. In making this argument, the petitioner asserts that the superior court erred in applying the rational-relation test in determining the constitutional question, in that the mentally ill represent at least a "quasi suspect" class thereby being entitled to a middle-tiered level of equal-protection scrutiny under the United State Supreme Court's multi-tiered equal-protection classification system. See Sterling v. Harris, 478 FSupp. 1046 (N.D. Ill. 1979). (2) The Commission's decision violates the policy of this state as expressed in OCGA § 37-5-2 (Code Ann. § 99-3302). (3) The Commission's decision is null and void because the petitioner's governmental function of providing housing for the mentally retarded is immune from operation of the Resolution. (4) The Commission's decision is null and void because it does not treat five mentally retarded individuals living with two surrogate parents as a "family," in violation of Georgia law and case law from other jurisdictions.

The respondent-in-certiorari sought dismissal of the petition for writ of certiorari on various procedural grounds. As to the petitioner's attacks on the Commission's decision, the superior court ruled as follows: (1) There is a rational basis for the definition of occupancy of a single-family dwelling contained in the Resolution, and the petitioner has failed to show that mentally retarded adults fall within a suspect classification under the equal-protection clause. (2) OCGA § 37-5-2 (Code Ann. § 99-3302) does not in any way require or imply that group family homes be allowed in any particular

location. (3) Although the petitioner is a governmentally financed organization with its employees paid by the state, this home is being operated by a nonprofit organization or corporation and not a governmental agency or department. And, the petitioner is not an organization of such a governmental nature as to exempt it from regulation by local zoning ordinances. (4) *Douglas County Resources v. Daniel,* 247 Ga. 785 (280 SE2d 734) (1981), was found to be distinguishable.

Accordingly, the decision of the Commission denying the petitioner's proposed amendment to the Resolution was sustained.

1. In 1972, the General Assembly enacted the Community Services Act for the Mentally Retarded. As stated in the preamble, this Act is intended to authorize county boards of health to provide comprehensive community services for certain mentally retarded and other developmentally disabled persons and to authorize the Department of Public Health (now Department of Human Resources) to encourage and assist the county boards of health in planning and developing community services. Ga. L. 1972, p. 700. Under § 2 of the Act (OCGA § 37-5-2 (Code Ann. § 99-3302)), the State of Georgia accepts a responsibility for its mentally retarded citizens, and the primary purpose of the Act is stated to be to provide community-based alternatives to total institutional care so that mentally retarded individuals can continue to live in their home communities. OCGA § 37-5-5 et seq. (Code Ann. § 99-3305).

2. It is true that the Resolution does contain separate classification for mentally ill or retarded individuals. However, the group homes for the mentally retarded which have been proposed here do not constitute permissible uses within single-family zoning districts, not because the inhabitants of the homes are mentally retarded, but rather because the inhabitants of the homes do not constitute one of the following: "[1] One (1) person or two (2) or more persons related by blood or marriage, with no more than two (2) roomers or boarders, and with any number of natural children, foster children, stepchildren or adopted children; or [2] a group of not more than four (4) persons not necessarily related by blood or marriage." In our opinion, there is nothing on the face of this definition of "family" which discriminates against mentally retarded individuals, and in our view, this definition of family withstands equal-protection scrutiny under Village of Belle Terre v. Boraas, 416 U. S. 1 (94 SC 1536, 39 LE2d 797) (1974).

Had the proposed group homes here been for a group of mentally retarded individuals and/or surrogate parents who constitute not more than four persons not related by blood or marriage, then a refusal to permit such homes in single-family districts would have

constituted discrimination against the mentally retarded. This would have brought the case more in line with our holding in *Douglas County Resources v. Daniel,* supra, wherein suit was brought to enjoin construction of a house as a group family residence for retarded citizens. The home was being constructed in a zoning district authorizing family residences and defining family as " '[o]ne or more persons occupying a dwelling unit and living as a single, nonprofit housekeeping unit.' " 247 Ga., supra at p. 786. Noting that there was no requirement in this ordinance that the parties occupying a housekeeping unit be related and that under the evidence the intended use of the home for retarded citizens was within the zoning classification, we held that, "To enjoin the use of the homes here because the intended occupants are retarded would discriminate against one group for reasons not established by the evidence." Id. The *Douglas County* case is, therefore, distinguishable from the present case.

3. It is a general rule that in their use of land a state government and its agencies are immune from operation of local zoning regulations. See City of Temple Terrace v. Hillsborough Assn. for Retarded Citizens, Inc., 322 S2d 571 (Fla. App. 1975). Comment, Government Immunity from Local Zoning Ordinances, 84 Harv. L. Rev. 869 (1971).

As pointed out in these primary and secondary authorities, this rule is supported by essentially four traditional tests: The Superior Sovereign Test, the Governmental Propriety Test, the Power of Eminent Domain Test, and the Statutory Guidance Test. The Superior Sovereign Test holds that since the state and its units and agencies occupy a superior position to municipalities in the governmental hierarchy, their exemption from municipal zoning regulation is a matter of preemption. The Governmental-Propriety Test holds that property of a state governmental unit is exempt from local zoning when a governmental function is being performed but not when a proprietary function is being performed. Cases applying the Power of Eminent Domain Test take the position that when a political unit is authorized to condemn, it is automatically immune from local zoning regulation when it acts in furtherance of its designated public function. Under the Statutory Guidance Test, the courts simply look to the legislative statutes in order to glean some expression of legislative intent on the immunity question.

For various reasons, all of these tests have been criticized, as constituting nothing more than "unhelpful epithets." Comment, supra, 84 Harv. L. Rev., at p. 869. It thus has been suggested that these tests should be eschewed in favor of a balancing-of-interests test to resolve "the critical question of which governmental interest

should prevail when there is a conflict between the zoning ordinance of one political unit and the statutory authority of another unit to perform a designated public function." Id. Accord, City of Temple Terrace v. Hillsborough Assn. for Retarded Citizens, Inc., supra.

4. In Georgia, it has been held that property owned by the state or county, and used for a governmental purpose, is exempt from municipal zoning regulation, whether or not the property is acquired by eminent domain or by bargain and sale. *Evans v. Just Open Government,* 242 Ga. 834 (1) (251 SE2d 546) (1979) and cits. See also Attorney General Opinion 73-164 (opining that where a county board of health establishes a group home for mentally retarded individuals under the Community Services Act for the Mentally Retarded, a municipality is without authority to enforce zoning restrictions against this activity).

5. In at least three cases, there has been consideration of the specific question of whether a nonprofit corporation or association is exempt from local zoning laws in its operation of a community home for mentally retarded individuals. Region 10 Client Management, Inc. v. Town of Hampstead, 424 A2d 207 (N. H. 1980); Penobscot Area Housing Development Corp. v. City of Brewer, 434 A2d 14 (Me. 1981); City of Temple Terrace v. Hillsborough Assn. for Retarded Citizens, Inc., supra.

(a) In Region 10, supra, it was found that the nonprofit corporation there had been designated by the Director of the Division of Mental Health for the State of New Hampshire to provide services, including community services for the retarded. It was held that the enabling state legislation establishing a statutory scheme for placing developmentally impaired persons in various locations throughout the state thereby preempted local zoning authority.

(b) Penobscot, supra, involved a nonprofit corporation organized to provide housing for retarded citizens pursuant, in part, to state legislation entitling the mentally retarded to living accommodations in an environment least restrictive of their liberty. The court rejected the argument that the corporation was exempt from local zoning regulation, stating that it "[could] not conceive that by the statute cited the Legislature intended to exempt all such corporations from local zoning ordinances." 434 A2d, at p. 19.

(c) In City of Temple, supra, the trial court had held that an association's operation of a home for the mentally retarded was immune from a city zoning ordinance, on the ground that under the facts of that case the association stood in the shoes of the state in operating this home. The Florida Second District Court of Appeals reversed this judgment and remanded the case for further proceedings, holding that the traditional tests for determining

whether a governmental unit is immune from the zoning law of a competing governmental unit should be jettisoned, and the admittedly nebulous balancing-of-interests test should be used to resolve the immunity question.

6. We reject the balancing-of-interests test, because it suffers too severely from its admitted flaws, i.e., it is too nebulous and judicially unmanageable. We find the better rule to be that property owned by a nonprofit corporation is not immune from local zoning regulations, even if the corporation is performing services which are governmental in nature, at least in the absence of a clear expression of intent by the legislature that such immunity be extended. We find no such expression of legislative intent in the Community Services Act for the Mentally Retarded.

*Judgment affirmed. All the Justices concur, except Smith and Gregory, JJ., who dissent.*

DECIDED APRIL 4, 1984 —
REHEARING DENIED MAY 1, 1984.

*Sell & Melton, Richard B. Miller,* for appellant.
*O. Hale Almand, Jr., W. Terrell Wingfield, Jr.,* for appellee.
*Jonathan Zimring,* amicus curiae.

GREGORY, Justice, dissenting.

I respectfully dissent for the reason that I would hold the Macon Association for Retarded Citizens (MARC) is immune from local zoning ordinances in its performance of services mandated by state law which, but for the program of MARC, would be performed by the state. I base this in part on the rationale of Temple Terrace v. Hillsborough Assn. for Retarded Citizens, 322 S2d 571 (Fla. App. 1975), rejected by the majority. I would not reach the equal protection argument considered by the majority.

1. The Florida court in *Temple,* supra, found that the Association was performing services which the state was required to do under state law; the agency closely supervised the services provided by the Association; and the Association's services supplemented those provided statewide by the agency. (The court went on to say that the trial court, on remand, should apply a "balancing of the interests" test to determine if the Association enjoyed governmental immunity from local zoning laws. This new "balancing of the interests" test need not be adopted, because the old tests are adequate to resolve the issues in this case.)

The rationale of *Temple,* supra, leads to the conclusion that

MARC's claim to governmental immunity is the same as the state's. As in *Temple,* MARC has contracted with the state agency, DHR, to provide the group home services. The contract provides for payment of state funds to MARC for salaries of personnel and maintenance of the residence. (The construction of the residence is to be financed by a federal grant from HUD.) State law expresses a policy for community placement of mentally retarded individuals, OCGA § 37-5-2 (Code Ann. § 99-3302), and places on county boards of health the obligation of providing such community services, OCGA § 37-5-5 (Code Ann. § 99-3305). Should a county board fail to meet its obligation, however, DHR is empowered to establish community services. OCGA § 37-5-7(b) (Code Ann. § 99-3307). One approved method of providing such services is for DHR to contract with private associations like MARC. OCGA § 37-1-20(b)(3) (Code Ann. § 88-603). See also, 1973 Opinions of the Attorney General of Georgia, 73-164. Operation of group homes is regulated and closely monitored by DHR. See *Georgia Department of Human Resources, Standards for Group Homes for the Mentally Retarded, November 1976.*

From these authorities, the conclusion is easily reached that MARC, although a private association, is performing functions which are mandated by state law and would otherwise be performed by the state. Therefore, MARC is entitled to invoke the doctrine of governmental immunity to the same extent the state would be entitled were it operating the group home.

2. The question then becomes whether there would be immunity from the zoning ordinance if the state were operating the group home rather than MARC.

As discussed in the majority opinion, there are four traditional tests and one recent test in use to determine whether a state activity is immune from local zoning ordinances. The traditional tests are: the superior-sovereign test, the governmental-proprietary test, the eminent-domain test, and the statutory-guidance test. The more recent test is one of balancing the interests. See Note, 84 Harv. L. Rev. 869 (1971). I would hold that overriding these tests is the principle that the clearly established public policy of the state may not be frustrated by local control. Thus, McQuillian writes: "On functions of statewide interest and concern, the general rule is that if the municipalities are not given specific authority to take over the function, the municipalities cannot thwart the state from performing its duty. Municipal zoning ordinances cannot be used to frustrate the implementation of state policy." (Citing Region 10 Client Management v. Town of Hampstead, 120 N. H. 885 (424 A2d 207) (1980)). Courts holding that operation of a state-supported group home is entitled to immunity include Region 10 Client Management,

supra; Berger v. State, 71 N. J. 206 (364 A2d 993) (1976); Connors v. New York State Assn. of Retarded Children, 82 Misc. 2d 861 (370 NYS2d 474) (1975); Ellis v. Liddle, 520 SW2d 644 (Mo. App. 1975) (state policy preempts local ordinance); City of Baltimore v. State Dept. of Health &c. Hygiene, 38 Md. App. 570 (381 A2d 1188) (1978).

Georgia statutes express a strong policy in favor of community placement of mentally retarded persons. Chapter 5 of the Mental Health Code, enacted by 1972 Ga. Laws 700, is entitled "Community Services Act for the Mentally Retarded." OCGA § 37-5-2 (Code Ann. § 99-3302), entitled "Declaration of Policy," states: "Since the State of Georgia accepts a responsibility for its mentally retarded citizens and an obligation to them which it must discharge, facilities, programs, and services shall be made available to meet the needs of each mentally retarded person during his entire lifetime. *The primary purpose of this chapter shall be to provide community-based alternatives to total institutional care so that mentally retarded individuals can continue to live in their home communities.*" (Emphasis supplied.) The state's commitment to deinstitutionalization and community placement of mentally retarded persons is further reflected at OCGA § 37-4-121 (Code Ann. § 88-2503.21): "It is the policy of the state that the least restrictive alternative placement be secured for every client at every stage of his habilitation. It shall be the duty of the facility to assist the client in securing placement in noninstitutional community facilities and programs." The Community Service Act grants to DHR "all powers necessary to effectuate the purposes" of the Act. OCGA § 37-1-20 (b)(13) (Code Ann. § 88-603).

State policy favoring community placement of mentally retarded citizens can also be found in pronouncements of the judicial and executive branches of government. This court's decision in *Douglas County Resources v. Daniel,* 247 Ga. 785 (280 SE2d 734) (1981), indicated a strong preference for community placement. In the executive branch, *The Governor's Policy Statement* (Office of Planning and Budget 1982) concludes: "Community-based services must continue to be the foundation of Georgia's service delivery system . . . consistent with the goal of . . . least restrictive environment." Id. at 44-45. See also, *Status Report on the Development* of Mental Retardation Community Residential Services (DHR 1982); *Standards for Group Homes for the Mentally Retarded* (DHR 1976).

These strong statements of policy favor MARC's claim of governmental immunity from operation of the Bibb County ordinance. To allow Bibb County to "zone out" the proposed group home would unquestionably frustrate the implementation of a

clearly articulated state policy. See Region 10 Client Management, Inc., supra. The proposed land use is functionally equivalent to uses already allowed in the zoned districts, that is, single family residential. As in *Douglas County,* supra, the surrogate parents and mentally retarded clients will function as a single housekeeping unit, contributing to upkeep, household chores, etc. The outward physical appearance of the group home (and with a few exceptions, the interior) will be identical to other homes in the neighborhood. The house will cost $133,000 to build. Thus the group home should be unobtrusive and have little, if any, adverse effect on the surrounding neighborhood.

I would reverse.